(7) granting the motion of the plaintiffs for summary judgment.

**YANKTON SIOUX TRIBE, a federally recognized tribe of Indians, and its individual members, and Darrell E. Drapeau, individually, a member of the Yankton Sioux Tribe, Petitioners,**

v.

**U.S. ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

No. Civ 96–4268.

United States District Court,
D. South Dakota,
Southern Division.

Dec. 11, 1996.

pany, and consequently, there was no resulting withdrawal liability. In the case at bar, no such condition to the transfer of ownership to Acquisition existed.

A similar issue was addressed in *Pension Benefit Guaranty Corp. v. Dickens,* 719 F.2d 146 (6th Cir.1983). In *Dickens,* Heinicke Instruments Co. attempted to purchase the corporate parent of the withdrawing entity; however, the withdrawing entity was already in Chapter 11 bankruptcy. As a result, the purchase could not be consummated without approval of the bankruptcy court. The court found that the purchase was merely an "attempted purchase." In the case at bar, no such pre-condition attended the consummation of the transaction on June 18, 1989.

See also 890 F.Supp. 878.

James G. Abourezk, Abourezk Law Offices, Sioux Falls, SD, for petitioners.

Joshua M. Levin, U.S. Department of Justice, Washington, DC, Karen E. Schreier, U.S. Attorney, Bonnie P. Ulrich, U.S. Attorney's Office, Sioux Falls, SD, Andrew Gordon, Thomas Speicher, Office of General Counsel, Washington, DC, Thomas A.

Speicher, U.S. Environmental Protection Agency, Denver, CO, Andrew Gordon, Environmental Protection Agency, Washington, DC, Jack McGraw, U.S. Environmental Protection Agency, Denver, CO, Joshua M. Levin, Department of Justice, Land & Natural Resources Division, Washington, DC, Lois J. Schiffer, U.S. Department of Justice, Environmental Defense Section, Washington, DC, for respondent.

MEMORANDUM OPINION AND ORDER

PIERSOL, District Judge.

The petitioners, Yankton Sioux Tribe and Darrell E. Drapeau (the Tribe), filed on September 17, 1996, and then later amended, a petition for judicial review of a June 26, 1996, final decision of the United States Environmental Protection Agency, Region VIII (EPA). In the final administrative decision at issue, the EPA granted the request of Southern Missouri Recycling and Waste Management District, the owner/operator of a Subtitle D municipal solid waste landfill under construction on non-Indian land within the exterior boundaries of the Yankton Sioux Reservation, to waive the composite liner requirement[1] for the landfill facility pursuant to 40 C.F.R. § 258.40(e). In accordance with an expedited schedule set by the Court, the EPA filed its answer to the amended petition, the complete administrative record that existed before the EPA at the time it reached its final decision, and its motion for summary judgment. The Tribe also filed a brief in opposition to the EPA's summary judgment motion. The Court has considered the lengthy administrative record, the parties' briefs, and oral arguments presented on Wednesday, December 4, 1996. For the reasons stated below, the Court grants the EPA's motion for summary judgment and affirms the EPA's final decision to waive the composite liner requirement in favor of the District under § 258.40(e).

## I. Jurisdiction, Standard of Review, and Issues Presented

The Court has jurisdiction of this proceeding under 28 U.S.C. § 1331 and 5 U.S.C. § 702. The EPA challenged the Court's jurisdiction in its answer to the amended petition, but the EPA did not raise and brief the issues of jurisdiction and venue in its motion for summary judgment, and thus, the Court deems any such issues abandoned. Even though the case is before the Court procedurally on the EPA's motion for summary judgment, the scope of the Court's review is far more narrow than that ordinarily permitted under Federal Rule of Civil Procedure 56.

Under the Administrative Procedures Act, the Court must make an independent decision based upon the identical record that was before the agency. *See* 5 U.S.C. § 706(2)(A); *Wilkins v. Secretary of the Interior*, 995 F.2d 850, 853 (8th Cir.1993), *cert. denied*, 510 U.S. 1091, 114 S.Ct. 921, 127 L.Ed.2d 214 (1994). The Court must accept the EPA's findings and conclusions unless they are arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. *Wilkins*, 995 F.2d at 853. An arbitrary and capricious decision exists if the EPA " 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.' " *Von Eye v. United States*, 92 F.3d 681, 685 (8th Cir.1996) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983)).

The Tribe argues in its brief that the EPA's decision to waive the composite liner requirement is arbitrary and capricious because the decision is inconsistent with the agency's own unambiguous regulation, 40 C.F.R. § 258.40(e),[2] the agency's action effec-

1. A composite liner consists of a minimum 30–mil flexible membrane liner placed over a layer of at least two feet of compacted soil with a hydraulic conductivity of no more than $1 \times 10^{-7}$ centimeters per second. 40 C.F.R. § 258.40(b).

2. 40 C.F.R. § 258.40(e) provides:

If EPA does not promulgate a rule establishing the procedures and requirements for State compliance with RCRA section 4005(c)(1)(B) by October 9, 1993, owners and operators in unapproved States may utilize a design meeting the performance standard in § 258.40(a)(1)

tively modified or amended the regulation in violation of the Administrative Procedures Act, and the technical basis for the waiver is unsupported. The EPA resists each of the Tribe's claims.

## II. Procedural History and The Administrative Record

On June 14, 1995, this Court required the District to install a composite liner in its facility for three reasons: (1) the EPA had not made a final decision on the applications submitted to it by the State of South Dakota and the Yankton Sioux Tribe, each requesting a determination of adequacy of their Subtitle D Municipal Solid Waste Permit Programs over lands within the exterior boundaries of the Yankton Sioux Reservation; (2) a federal regulation requires installation of a composite liner and leachate collection system in a Subtitle D facility if noncontainerized leachate derived from the facility will be recirculated into the open cells, as was planned at the District's facility, *see* 40 C.F.R. § 258.28(a)(2); and (3) at trial the District offered to construct the facility with a composite liner. *Yankton Sioux Tribe v. Southern Missouri Waste Management Dist.,* 890 F.Supp. 878, 890 (D.S.D.1995). The District did not appeal the Court's Order and Judgment requiring the composite liner.[3] Rather, in September 1995, District officials and members of the District's engineering firm, Bernhard, Eisenbraun, and Associates, through the assistance of South Dakota's congressional delegation, arranged a meeting in Washington, D.C., with Carol Browner, EPA Administrator, to seek an administrative waiver of the composite liner requirement. (Admin.Rec. at 144–200, 213–419.)

At the meeting, held on September 19, 1995, District participants informed Administrator Browner that the State of South Dakota had determined in 1993 that the District's proposed facility could be built without a composite liner, but this Court had ruled in 1995 that the District must meet the federal landfill design criteria, including the composite liner.[4] The District indicated that the composite liner would result in substantial additional cost to be borne by a rural population. (*Id.* at 417.) Administrator Browner referenced this Court's June 1995 ruling that the Yankton Sioux Reservation has not been disestablished and observed that the EPA could not delegate its Subtitle D enforcement authority to another entity without a demonstration of that entity's jurisdiction over the lands in question. (*Id.* at 418.) Representatives of the State of South Dakota argued that the EPA should delegate its enforcement authority to the State for all non-Indian lands located within the exterior boundaries of the Reservation, particularly because this Court held in *Yankton Sioux Tribe* that the Tribe did not have civil jurisdiction to regulate the District's proposed landfill facility located on non-Indian land within the Reservation. The State argued that, in light of legal developments in federal Indian law, the EPA should revise its 1984 Indian Policy,

[compacted clay liner without a membrane liner] if the following conditions are met:
    (1) The State determines the design meets the performance standard in § 258.40(a)(1);
    (2) The State petitions EPA to review its determination; and
    (3) EPA approves the State determination or does not disapprove the determination within 30 days.

**3.** The State appealed the Court's ruling that an 1894 Act of Congress ratifying an agreement between the Yankton Sioux and the United States for the sale of surplus lands did not disestablish the exterior boundaries of the Yankton Sioux Reservation as determined in an 1858 Treaty. The United States Court of Appeals for the Eighth Circuit recently affirmed the Court's jurisdictional ruling. *Yankton Sioux Tribe v. Southern*

*Missouri Waste Management Dist.,* 99 F.3d 1439 (8th Cir.1996).

**4.** The state administrative record supporting the decision of the State Board of Minerals and Environment, following a contested case hearing, to issue a state permit to the District allowing construction without a composite liner was admitted into evidence as a trial exhibit in *Yankton Sioux Tribe* and was discussed by this Court in that opinion at 889–90. The State's decision was upheld in state circuit court and was not appealed to the South Dakota Supreme Court. *Yankton Sioux Tribe,* 890 F.Supp. at 890. The decisions of the Board of Minerals and Environment and the state circuit court were provided to Administrator Browner in an appendix of materials submitted by the District, along with a four-page excerpt of this Court's June 14, 1995 decision. (Admin.Rec. 170–77.)

which favored granting EPA authority to Tribes over non-Indians.[5] (*Id.* at 419, 429–32.) South Dakota's United States Representative Tim Johnson stated that certainty was needed. South Dakota's Senator Tom Daschle noted that timing was crucial because the contractor was on site working, the communities involved should be rewarded for their efforts, and that he was prepared to address the District's concerns legislatively if an administrative decision could not be reached. (*Id.* at 418–19.) South Dakota Senator Larry Pressler was present at the meeting, but the minutes do not reflect that he spoke.[6] Administrator Browner informed the group that EPA wished to provide flexibility for the appropriate parties to arrive at a reasonable solution, that EPA would decide whether it had the legal authority to waive the composite liner requirement at the District's request, and that, if the EPA were to consider directly whether the liner requirement should be waived, the EPA would have to be satisfied that environmental standards were met. (*Id.* at 419.)

On September 21, 1995, six days after the Washington meeting, District officials sent a letter to Nettie Myers, Secretary of the South Dakota Department of Environment and Natural Resources, asking the State to submit an application to the EPA under 40 C.F.R. § 258.40(e) seeking approval of the State's 1993 determination that the facility could be built without the composite liner. (*Id.* at 420.) On September 29, 1995, Dave Schaller, Chief of the EPA Region VIII Solid Waste Section, notified Brian Bernhard of the District's engineering firm that the EPA would permit the District to petition the agency directly for a waiver of the composite

liner requirement. (*Id.* at 434.) Upon learning that the State had already begun work on an application, Schaller stated that the EPA wished to receive an application from the District, not from the State. (*Id.*) In a subsequent telephone conversation between State and District officials, however, they agreed that they would each submit an application to the EPA. (*Id.*) Schaller confirmed the substance of his telephone call in a letter to Bernhard dated October 3, 1995.

On the same day, October 3, 1995, the State filed its application with EPA Region VIII requesting that the EPA grant a composite liner waiver for the District under § 258.40(e). Although the administrative record before the Court contains the cover letter written to EPA Region VIII Administrator William Yellowtail by Nettie Myers, the supporting application materials are not included. (*Id.* at 436–37.) Her letter certified that "the alternative liner design meets EPA's performance standard established in 40 CFR Part 258.40(a)(1)." (*Id.* at 437.) In an October 31, 1995 letter to Myers, Yellowtail refused to accept the State's application for a composite liner waiver "[s]ince South Dakota does not currently have program approval over the Yankton lands," and returned the application to her. (*Id.* at 1045.) In reply, Myers indicated her "great disappointment" in the return of the State's petition because

we believe the United States District Court's decision is quite clear in that the Yankton Sioux Tribe has no authority to regulate solid waste landfills on fee lands within the exterior boundaries of the reservation. EPA's refusal to acknowledge this fact coupled with a flawed, outdated Indian

---

5. Lawrence E. Long, South Dakota Chief Deputy Attorney General, who attended the Washington meeting with Administrator Browner, followed up his remarks at the meeting with a letter to Browner on September 26, 1995, in which he set out a legal analysis to support his suggestion that EPA's 1984 Indian policy should be revised. (Admin.Rec. at 429–32.)

Specifically as to the Yankton Sioux Reservation, he argued that the EPA should "delegate program authority over non-Indian lands to the State, delegate program authority over Indian lands to the Tribe (when it has submitted an approvable program), and take the lead in ob-

taining an agreement between the State, Tribe and EPA." (*Id.* at 432.) Long suggested that people living on the reservation would be denied equal environmental protection if EPA failed to delegate its authority to any entity because EPA apparently did not intend to take direct action to enforce regulations on the reservation and enforcement would be left to citizen lawsuits. (*Id.*)

6. Senator Pressler communicated with Administrator Browner by letter and urged her to waive the composite liner for the District, but he also submitted to her letters from his constituents opposing the liner waiver. (Admin.Rec. at 1155, 1734, 1748.)

jurisdiction policy is costing the Southern Missouri Recycling and Waste Management District a great deal of time and money.

(*Id.* at 1058.) Brian Bernhard also wrote to Yellowtail inquiring why the State's application was refused. He observed that, if EPA viewed South Dakota as an "unapproved State," then the State should have been entitled to submit a waiver petition on the District's behalf under the plain wording of § 258.40(e). (*Id.* at 1056–57.)

On October 5, 1995, the District submitted its application to EPA Region VIII. (*Id.* at 441–984.) The application was comprised of three sections. Section 1 provided technical documentation to establish the performance of the alternative liner design. This section contained all of the technical data that had been submitted to the State in 1993 to justify the state permit allowing construction without a composite liner. This information included a 1993 site characterization study prepared for the District by Bernhard, Eisenbraun, and Associates, and the District's 1993 Solid Waste Disposal Permit Application submitted to the State. (*Id.* at 445–915.) Section 2 of the application to the EPA included copies of the state and federal decisions regarding the landfill and Lawrence Long's September 26, 1995 letter to Administrator Browner. (*Id.* 916–66.) Section 3 included the newspaper notice and minutes of a July 8, 1993 public meeting on the District's state permit application and two newspaper notices announcing approval of the District's state permit application. (*Id.* at 967–84.)

On October 12, 1995, David Schaller of EPA Region VIII notified Brian Bernhard by letter that the District's application had been received on October 6, 1995, but informed the District that the EPA did not consider the thirty-day time period for approval or disapproval contained within § 258.40(e)(3) to be binding in this situation. Schaller indicated that, if the EPA's review required longer than thirty calendar days, the EPA would not consider the District's petition for a composite liner waiver as automatically granted at the expiration of thirty days pursuant to § 258.40(e)(3). (*Id.* at 989–

90.) Brian Bernhard telefaxed letters on October 16, 1995, to David Schaller and Administrator Browner complaining about the EPA's decision not to apply the thirty-day time period for review. (*Id.* at 991–95.) Schaller responded on October 17 that the EPA was acting expeditiously and in good faith to meet the District's concerns, and that the EPA nonetheless expected to complete its review of the District's application within thirty days, by November 6, 1995. (*Id.* at 996–97.) Schaller stated:

> My understanding of the September 19th meeting is that Administrator Browner was careful to point out that a determining factor for any EPA decision would be to make the correct decision from an environmental standpoint. We have your substantial technical documentation now under review in the expectation of being able to honor her commitment to environmental protection in this matter.

(*Id.* at 996.) At other points in the review process, Jack Hidinger, Program Director, EPA Region VIII Office of Pollution Prevention, State and Tribal, noted in messages to other EPA officials the need for the agency to make a correct environmental decision and not to "cut any administrative corners in making this decision." (*Id.* at 1041, 1067.)

On October 18, 1995, the EPA identified the technical data in the District's application that supported a waiver of the composite liner requirement, as well as problematic data. (*Id.* at 1000.) On October 19, 1995, David Schaller wrote a letter to Brian Bernhard explaining that, normally, the EPA's evaluation and decision would be based solely upon information provided in the application. Schaller informed Bernhard that "we are doing the groundwater modeling necessary for us to determine the amount of leachate generated and expected to be transported from the landfill. Ordinarily, this modeling would need to be performed by the owner/operator, in this case, the District." (*Id.* at 1001.) Schaller indicated that the EPA would also factor into its analysis an offer by the District's contractor to provide a three, rather than a two, foot compacted clay liner, but indicated that the new information could lengthen the EPA's review process and that

the EPA could not assist the District in persuading the contractor to remain on the job site. (*Id.* at 1001–02.)

On October 20, 1995, the EPA contracted with ERG, Inc., to evaluate the District's petition to determine if the proposed alternative design meets the standard of § 258.40(a)(1), to verify any modeling included within the application, and to conduct any necessary modeling not included within the application. The EPA instructed the contractor to use HELP and MULTIMED models and, if the alternative two-foot compacted clay design did not meet the appropriate standard, to consider whether a three-foot compacted clay liner would meet the standard.[7] (*Id.* at 1003–35.)

By October 30, 1995, scientists reviewing the District's application identified from their preliminary evaluation data omissions or concerns relating to the application. (*Id.* at 1042.) The experts developed a list of more conservative assumptions and/or input parameters that would be used in running the HELP and MULTIMED models, and in some cases they chose to consider technical circumstances that would result in a worst case scenario. (*Id.* at 1046–52.)

On November 27, 1995, twenty individuals representing the EPA (Headquarters and Region VIII), the District and its engineering firm, the State, the Tribe, Charles Mix County Commission, and the congressional offices of Senator Daschle and Representative Johnson participated in a telephone conference call during which the EPA announced its tentative decision to waive the composite liner requirement and its intention to make materials available to the public for thirty days for the purpose of receiving public comment on the petition, the administrative procedures used by the EPA, and the technical data generated by the EPA contractor. (*Id.* at 1060.) The same day counsel for the Tribe, James Abourezk, notified William Yellowtail by letter of the Tribe's position that the EPA lacked statutory authority to grant a waiver and his belief that the agency had reached its decision as a result of political pressure. He asked the EPA to reverse its tentative decision. (*Id.* at 1062.) On November 30, 1995, following the conference call, Bill Monheiser of EPA Region VIII wrote an internal memorandum to Linda Walters stating:

> My normal tendency would be to error (sic) on the side of caution and deny the application for waiver of the liner requirement. . . .
>
> There is an increased risk to human health as a result of waiving the liner requirement, as long as the population effected (sic) is aware of this increased risk and agrees, I would be inclined to allow a waiver of the liner requirement. The quantity and quality of the ground water effected (sic) is very poor and my concerns about protecting the resource are limited.

(*Id.* at 1064–65.) In an addendum to his memorandum on December 4, 1995, Monheiser advised Walters: "There is always a small risk of leakage from landfills. Use of less than ideal soils for liner construction increases this risk, in this case, the risk is increased by a small amount. As long as the effected (sic) population is informed and they [are] willing to accept this increased risk, I feel a waiver is appropriate." (*Id.* at 1068.)

The same day, December 4, 1995, the EPA released its "Technical Review Of The Alternative Landfill Liner Petition For The Lake Andes, South Dakota, Proposed Landfill Site." (*Id.* at 1069–1151.) In the Technical Review, the agency identified data omissions in the District's application and other concerns of the agency, explained the assumptions the agency adopted to meet those data omissions or concerns in conducting modeling, pointed out areas that needed additional clarification, such as whether leachate would be recirculated over the open cell of the landfill, and presented the technical results of the agency's modeling and evaluation. (*Id.* at 1075.) Based upon the modeling completed by the agency, the EPA concluded that the proposed alternative landfill design meets the performance standard of § 258.40(a)(1) at a selected point of

---

7. Brian Bernhard notified the EPA on October 24, 1995, that the District's contractor revoked the offer to install a three-foot compacted clay liner, so this issue became moot. (Admin.Rec. at 1037.)

compliance of 150 feet from the facility unit boundary. The agency cautioned that "[t]hese results are based on modeling using conservative assumptions for input values and, therefore, provide a conservative determination of the alternative design performance. The conclusions reached during this evaluation are based on assumed parameters; they may not be valid if the assumed parameters are altered." (*Id.* at 1084.)

On December 5, 1995, Jack Hidinger wrote a memorandum to the file on the subject of "Modification of the Municipal Solid Waste Landfill Liner Petition Process." It read:

> This memorandum is intended as notification by the United States Environmental Protection Agency ("EPA") that it will augment its Municipal Solid Waste Landfill Liner Petition Process [40 CFR Part 258.40(e) ] and Interim Final Guidance dated September 20, 1993, to address extraordinary circumstances such as situations where both a State and a Tribe have unapproved programs and where the owner/operator of a facility located on disputed lands wishes to have EPA consider an alternative liner petition.

> As discussed in 40 CFR 258.40(e), the State or Tribe is ordinarily responsible for making the initial decision that the alternative design meets the performance standard and for petitioning EPA Regional offices to review the State/Tribal determination. In this situation, where neither the State nor the Tribe have approved programs and where the question of jurisdiction has yet to be decided, EPA Region VIII has decided to entertain municipal solid waste landfill liner petitions for alternative design directly from the owner/operator of the landfill located on the disputed lands. EPA Region VIII will conduct its own independent review of such petitions and publish its findings in the local newspaper. Such findings should not be construed to confer jurisdiction of the landfill located on disputed lands to either the State or the Tribe.

(*Id.* at 1152.) The administrative record contains no explanation as to who may have seen this memorandum to the file or received a copy of it.

The EPA conducted two public hearings on January 24, 1996, at the Wagner, South Dakota, National Guard Armory, and at the Fort Randall Casino operated by the Tribe. EPA Hearing Officers Al Smith and Linda Walters accepted public comments from interested parties in favor of and in opposition to the EPA's tentative decision. The EPA also accepted numerous letters and comment papers from interested parties. (*Id.* at 1190, 1193–1743.) While the Tribe, some of its members, the Tribe's expert witnesses Henry Mott and Perry Rahn, environmental activists, and some community members opposed the EPA's tentative decision, by far the majority of comments submitted to the EPA supported the agency's tentative decision.

Following the public hearings, the EPA obtained further consultation on the civil/geotechnical engineering aspects of the District's application from Steve Laudeman, a solid waste official with the State of Colorado. (*Id.* at 1744–45, 1751–57.) The EPA also unsuccessfully attempted to mediate a compromise solution between the District and the Tribe. (*Id.* at 1758–62, 1777.)

On June 26, 1996, the EPA issued its final decision granting the District's application for a waiver of the composite liner requirement and subsequently published notice of its final decision. (*Id.* at 1789–98.) The EPA placed six conditions on the District's receipt of the waiver:

a. A registered engineer must verify that the specified compaction of the clay liner has been achieved. EPA must review this verification before trash can be accepted.

b. Monitoring wells must be constructed and the results of the monitoring must be submitted to EPA every six months.

c. The leachate must be measured and tested. Leachate can be used for dust control, if tests show that it meets or exceeds standards for agricultural use. Otherwise, the leachate must be sent to a sewage treatment plant. EPA must receive annual reports.

d. After closure, the cap must be inspected every six months and maintained to prevent cracks and borrows (sic).

e. The District must prepare an evaluation of the prospects for recycling. EPA will provide technical assistance.

f. All other aspects of the operating plan must be followed.

(*Id.* at 1789.) These conditions were adopted in response to technical advice received by the EPA from Steve Laudeman and the scientists who reviewed the District's application, as well as in response to public comments received at the two public hearings in South Dakota. (*Id.* at 1800.)

## III. Legal Analysis

The Court must first consider the Tribe's argument that the EPA's decision to waive the composite liner requirement is arbitrary and capricious because the decision is inconsistent with the agency's own unambiguous regulation. The Tribe argues that § 258.40(e) expressly permits only a "State" to submit a waiver application and that the regulation itself does not contain an alternative mechanism for the owner/operator of a Subtitle D facility to petition the EPA directly for such a waiver. The Tribe relies heavily upon the definition of "State" contained in the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6903(31),[8] and the recent decision of *Backcountry Against Dumps v. EPA,* 100 F.3d 147 (D.C.Cir.1996).

In *Backcountry,* on petition for review, the appeals court considered whether the EPA had authority to grant a final determination of adequacy under 42 U.S.C. § 6945(c) for a solid waste permitting plan submitted by the Campo Band of Mission Indians that would apply to all solid-waste operations on the 23–square mile Campo reservation. *Id.* at 148–50. In reviewing the tribe's application, the EPA relied upon its draft "State/Tribal Implementation Rule" which establishes procedures for EPA approval of tribal landfill permit programs. *Id.* at 149–50. After receiving public comment on the tribe's plan, the EPA issued a Final Determination of Adequacy. *Id.* This was the first time the

EPA had approved an Indian tribe's permitting program under RCRA. *Id.*

The appeals court vacated the EPA's Notice of Final Determination because the EPA had treated the Campo Band as a "State" in violation of the express language of § 6945(c)(1)(C), which permits the EPA Administrator to determine whether a "State has developed an adequate program under this paragraph." The appeals court noted that, within RCRA, Congress defined Indian tribes as municipalities, not as States. *See* 42 U.S.C. § 6903(13). Therefore, the court held that its analysis ended at the first step of *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), because the express and unambiguous statute spoke directly to the issue before the EPA, and the EPA failed to follow the explicit terms of the statute. *Backcountry,* at 149–50, 151–52.

The D.C. Circuit rejected the EPA's claims that, if the EPA cannot review and approve tribal solid waste management plans, a regulatory gap would exist on reservation land, "conjuring up the specter of Indian reservations as safe havens for all manner of illegal dumping activity." *Id.* at 151–52. The court said the EPA's argument ignored the fact that the federal revised criteria for landfill design automatically apply to owner/operators in areas with unapproved States or Tribes, and that citizen suits could be brought to enforce federal regulations. *Id.*[9] Near the end of the opinion, the court suggested that the EPA and the Campo Band need not wait for Congress to act to give the tribe the same flexibility as States with regard to a particular landfill proposed to be built in a seismic zone on the Campo reservation because the parties agreed at oral argument in the case that the tribe could seek EPA approval under 40 C.F.R. §§ 258.13–.14 for a site-specific regulation as to the placement of the solid-waste treatment facility in a fault area or seismic zone. *Id.* at 152.

---

**8.** This statute defines "State" as "any of the several States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands."

**9.** The availability of citizen suits does not answer the problem of how violations not apparent to a lay person would be detected or how citizen suits would be funded.

The issue before the EPA and this Court in this case is *not* whether the EPA exceeded its statutory authority in granting an application of the Yankton Sioux Tribe for a determination of adequacy under § 6945(c) to enforce its landfill regulations on all lands within the Yankton Sioux Reservation, that having been the issue in *Backcountry* regarding the Campo Band application. In the present case, at the time the EPA granted the District's site-specific application for a waiver of the composite liner requirement, the EPA had not approved either the State's or the Yankton Sioux Tribe's applications for a final determination of adequacy to enforce their regulations on lands within the Yankton Sioux Reservation.[10] Thus, *Backcountry* is factually and legally distinguishable from the case at bar.

The issue the Court must address is whether the EPA erred when it accepted an application for a composite liner waiver directly from the District, rather than from the State. To answer this question, the Court begins with the guiding principles of *Chevron.* The Supreme Court stated in that case that where "Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. [Those] regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron,* 467 U.S. at 843–44, 104 S.Ct. at 2782. "[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer[.]" *Id.* at 844, 104 S.Ct. at 2782. Provided the agency's interpretation does not violate the Constitution or a federal statute, it must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation. *Stinson v. United States,* 508 U.S. 36, 45, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993). "Thus, as a general rule, where the agency is interpreting its own regulations or its own legislative rules, that interpretation is entitled to substantial deference." *Shalala v. St. Paul–Ramsey Med. Ctr.,* 50 F.3d 522, 528 (8th Cir.1995). The Court must defer to the agency's interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the agency's intent at the time of the regulation's promulgation. *Id.*

■ The regulation, § 258.40(e), set out in footnote two of this opinion, provides that owner/operators in unapproved States may utilize an alternative design if three conditions are met: (1) the State determines the design meets the standard of § 258.40(a)(1); (2) the State petitions the EPA for review of its determination; and (3) the EPA approves the State determination or does not disapprove the determination within thirty days. The Tribe views the EPA's action in accepting and proceeding with the District's petition as constituting an unlawful amendment of an existing regulatory process, while the EPA characterizes its action as the appropriate augmentation of the existing regulatory process to address complicated legal, technical, and economic issues unique to this particular landfill project.

The Court concludes that the EPA's interpretation of § 258.40(e) is plainly erroneous and is inconsistent with the regulation. *See Stinson,* 508 U.S. at 45, 113 S.Ct. at 1919. The express language of § 258.40(e) specifically permits the EPA to review a petition submitted by a State, not by the owner/operator.[11] The State attempted to submit a

---

10. On September 16, 1996, the EPA reversed its April 7, 1994 tentative approval of the State's application. 61 Fed.Reg. 48683–86. The EPA determined, relying on this Court's *Yankton Sioux Tribe* opinion, that all fee lands within the exterior boundaries of the Yankton Sioux Reservation are Indian Country, as defined in 18 U.S.C. § 1151, and that the State failed to demonstrate it has authority to regulate on such fee lands "either pursuant to Congressional authorization or applicable principles of Federal Indian law[.]" 61 Fed.Reg. at 48685.

The State seeks review of the EPA's decision in *South Dakota v. EPA,* Civ 96–3042/96–4289 (D.S.D. Filed Oct. 8, 1996).

11. In reading Jack Hidinger's memorandum to the file, it appears the EPA also reads the regulation to equate Indian tribes with States, even though the word "Tribe" does not appear in the regulation as it does in some others. *See e.g.,* 40 C.F.R. § 258.14. Under the reasoning of *Backcountry,* the Court doubts that the EPA could accept a Tribe's petition under § 258.40(e) on behalf of an owner/operator.

petition on the District's behalf, but the EPA erroneously refused to accept the petition. Thus, authority for EPA's action in this case cannot be premised upon a plain reading of § 258.40(e).

■ The EPA argues that Congress delegated to it the authority to devise additional site-specific criteria for municipal solid waste landfills when the circumstances warrant such action, as in this case. The agency points the Court to RCRA sections 4004 and 4010, codified at 42 U.S.C. §§ 6944(a) and 6949a(c) respectively. These statutes broadly and explicitly direct the EPA to "promulgate regulations containing criteria for determining which facilities shall be classified as sanitary landfills and which shall be classified as open dumps[,]" 42 U.S.C. § 6944(a), and to "promulgate revisions of the criteria promulgated under paragraph (1) of section 6944(a) of this title ... for facilities that may receive hazardous household wastes[.]" 42 U.S.C. § 6949a(c)(1). In passing these statutes, Congress recognized that it was leaving a gap for the agency to fill and expressly directed the agency to promulgate regulations to fill that gap. *See Chevron,* 467 U.S. at 843-44, 104 S.Ct. at 2782.

Under the broad authority to promulgate regulations delegated to the agency by Congress in 42 U.S.C. §§ 6944 and 6949a(c)(1), the Court concludes that the agency did not act in a manner manifestly contrary to the substantive statutes or violate the Administrative Procedures Act when it developed a site-specific rule permitting the District to submit a petition for a waiver directly to the agency. *See Backcountry,* at 152. The purpose of § 258.40(e) is to allow owner/operators to take advantage of the alternative landfill design if scientific investigation reveals that the composite liner is unnecessary at the specific landfill location. Administrator Browner wanted to ensure that the flexibility provided in the regulation would remain available to the District in this case. In giving public notice of its tentative decision to grant the District's petition for a waiver and its intention to accept public comment on the tentative decision, the EPA stated:

> The owner/operator, Southern Missouri Recycling and Waste Management Dis-trict, proposes to build a municipal solid waste landfill on non-Indian land within the exterior boundaries of the Yankton Sioux Reservation. At this time, the EPA has not determined that the State or Tribe has authority over the site of the proposed Lake Andes landfill. The EPA Region VIII developed an alternative mechanism to allow the District to seek the waiver directly from the Region. The waiver was received on October 6, 1995.
>
> The EPA has reviewed the District's application and has made a tentative decision to approve their waiver.

(Admin.Rec. at 1160.) The agency intended to, and did create, a new right in the District under these circumstances to petition the agency directly, and thus, the agency's "alternative mechanism" is properly considered to be a legislative rule subject to the APA's notice and comment procedures rather than an interpretative rule. *Cf. General Motors Corp. v. Ruckelshaus,* 742 F.2d 1561, 1565 (D.C.Cir.1984) (en banc) (holding that EPA rule relating to repair of cars not in compliance with Clean Air Act was interpretative, not legislative, rule, and thus not subject to APA notice and comment procedures), *cert. denied,* 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985); *Fertilizer Institute v. EPA,* 935 F.2d 1303, 1308 (D.C.Cir.1991) (explaining *General Motors* holding that agency action is legislative when agency intends to create certain rights or duties, not whenever agency action has effect of creating rights or duties).

■ The Tribe argues that the EPA failed to satisfy the requirements of the Administrative Procedures Act. The Court concludes that the agency complied with applicable notice and comment procedures when it produced for public review the procedural and technical basis for its tentative decision, gave public notice of its tentative decision and invited public comment, held public meetings accessible to those most interested in the proceedings, accepted public comment in oral and written form, and utilized those comments in fashioning technical conditions placed on the waiver that was ultimately granted. *See* 5 U.S.C. § 553. The agency fulfilled its mission to decide the technical

**1482**

issue before it without "cutting any administrative corners." There is no evidence in the administrative record that the agency's decision was the product of political pressure, even though South Dakota's elected officials took an active interest in the EPA's process and decision.

 Finally, the Court concludes that the agency's final decision to waive the composite liner requirement for the District was not arbitrary and capricious because it is adequately supported by the scientific evidence in the administrative record. In *Yankton Sioux Tribe*, 890 F.Supp. at 891, this Court made "the same findings as those made by the South Dakota Board of Minerals and Environment" and credited the trial testimony of the District's engineers when the Court decided that the membrane liner was not required because of potential groundwater mounding, sand and gravel lenses, fissures and lineaments, or the presence of aquifers. The Court was concerned about the recirculation of leachate into the open cells, as was the EPA during its technical review of the District's petition. The EPA addressed the leachate recirculation issue by adding a specific condition to the grant of the waiver allowing the use of leachate only for dust control if the leachate meets standards for agricultural use and otherwise requiring disposal of the leachate at a sewage treatment facility. The Court cannot say, under the narrow review it may undertake, that the EPA " 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.' " *Von Eye*, 92 F.3d at 685 (quoted case omitted). Accordingly,

IT IS ORDERED:

(1) that the motion for summary judgment of the United States Environmental Protection Agency is granted. (Doc. 17.)

(2) that the decision of the United States Environmental Protection Agency to waive the composite liner requirement for the Southern Missouri Recycling and Waste Management District pursuant to 40 C.F.R. § 258.40(e) is affirmed.

### JUDGMENT

In accordance with the Memorandum Opinion and Order entered this date with the Clerk,

IT IS ORDERED, ADJUDGED, and DECREED that the motion for summary judgment of the United States Environmental Protection Agency is granted.

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that the decision of the United States Environmental Protection Agency to waive the composite liner requirement for the Southern Missouri Recycling and Waste Management District pursuant to 40 C.F.R. § 258.40(e) is affirmed.