AMERICAN MUNICIPAL POWER–OHIO, Petitioner,

v.

ENVIRONMENTAL PROTECTION AGENCY, Respondent.

No. 95–1290.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 3, 1996.

Decided Oct. 29, 1996.

David R. Straus, Washington, DC, argued the cause and filed the briefs, for petitioner.

Scott J. Jordan, Attorney, United States Department of Justice, Washington, DC, with whom Lois J. Schiffer, Assistant Attorney General, was on the brief, argued the cause, for respondent.

Before: EDWARDS, Chief Judge, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

An association of municipal electric systems challenges an Environmental Protection Agency rule interpreting the term "thermal energy" in section 410(f) of the 1990 Clean Air Act Amendments. According to petitioner, EPA's definition of the term denies its members an opportunity to transfer emissions allowances that other participants in Title IV's acid rain program enjoy. Because

we conclude that EPA's interpretation is reasonable, we deny the petition for review.

## I.

In Title IV of the Clean Air Act Amendments of 1990, Congress established a program to reduce acid rain by limiting the sulfur dioxide emissions of electric utilities through a system of transferable emissions allowances. 42 U.S.C. §§ 7651–7651*o* (1994). Under the program, EPA allocates annual emissions allowances to each utility "unit" based on the unit's past fuel consumption and emissions rate. 42 U.S.C. §§ 7651b(a)(1), 7651d; *see generally Texas Mun. Power Agency v. EPA*, 89 F.3d 858 (D.C.Cir.1996). If a unit's emissions exceed its allowances, the unit must either reduce emissions or obtain additional allowances. Conversely, a unit that has lowered its emissions rate, or has reduced its utilization or shut down, can either "bank" excess allowances for future use, or transfer them to another utility. By capping the number of allowances at 8.95 million tons of sulfur dioxide per year, *see* 42 U.S.C. §§ 7651b(a)(1) (basic allowances of 8.9 million tons), 7651d(a)(3) (providing for an additional 50,000 tons), the program aims to reduce annual sulfur dioxide emissions by ten million tons from 1980 levels, 42 U.S.C. § 7651(b).

Industrial sources of emissions, as well as existing units of small utilities—for example, those owned and operated by petitioner's members—are not required to participate in the allowance system. *See* 42 U.S.C. §§ 7651a(8) (unit serving a generator of less than 25 megawatts not an "existing unit"), 7651d(a)(1) (applying allowance requirements to each "existing utility unit"). Under section 410 of the Act, however, these units may "opt-in" to the program and receive allowances. 42 U.S.C. § 7651i(a). Allowances allocated to opt-in units are not counted toward the 8.95–million–ton cap. 42 U.S.C. § 7651b(a)(1). Opt-in units which lower their emissions rates are free to save or sell their unused allowances. But unlike utility units required to participate in the program, opt-in units may not transfer unused allowances after shutting down, unless the transfer falls within an exception for "thermal energy" set forth in section 410(f). That section, the meaning of which is the sole issue in this case, provides as follows:

> Any unit designated under this section shall not transfer or bank allowances produced as a result of reduced utilization or shutdown, *except that,* such allowances may be transferred or carried forward for use in subsequent years to the extent that the reduced utilization or shutdown results from the replacement of *thermal energy* from the unit designated under this section, with thermal energy generated by any other unit or units subject to the requirements of this subchapter, and the designated unit's allowances are transferred or carried forward for use at such other replacement unit or units.

42 U.S.C. § 7651i(f) (emphasis added).

EPA interprets "thermal energy" in section 410(f) to mean "the thermal output produced by a combustion source used directly as part of a manufacturing process but not used to produce electricity." 40 C.F.R. § 72.2 (1995). Because small utilities, unlike most industrial sources, do not produce "thermal energy" as defined by the agency, they cannot take advantage of section 410(f)'s exception to obtain allowances by opting-in and then retiring their existing units. Thus, when small utilities shut down old units, either replacing them or buying electricity from other utilities, they must purchase emissions allowances.

## II.

Petitioner AMP–Ohio, an association of some seventy-seven municipal electric systems, challenges EPA's interpretation of the thermal energy exception as contrary to the language, purpose, and legislative history of Title IV. This presents us with a typical *Chevron* issue. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Using "traditional tools of statutory construction," we first examine whether the statute "directly [speaks] to the precise question at issue." *Id.* at 842 & 843 n. 9, 104 S.Ct. at 2781 & 2782 n. 9. If so, we follow the statute's instructions. But "if the statute is silent or ambiguous with respect to the spe-

cific issue," we defer to the agency's interpretation, provided that it is reasonable. *Id.* at 843–44, 104 S.Ct. at 2781–83.

Title IV does not define "thermal energy," nor does its legislative history suggest a clear Congressional intent regarding the meaning of this more or less technical term. For this reason, we cannot "begin and end our analysis at *Chevron's* first step," as we could in *Backcountry Against Dumps v. EPA,* 100 F.3d 147, 150 (D.C.Cir.1996), another case this Court decides today. Rather, we proceed to step two of *Chevron,* asking whether EPA's interpretation of the term is reasonable.

Asserting that EPA's interpretation is too narrow, petitioner argues that the agency should define "thermal energy" to mean simply "heat," consistent with the term's literal meaning. Semantically speaking, petitioner has a point: Webster's defines "thermal energy" as "energy in the form of heat." *See Webster's Third International Dictionary* 2373 (1993). Under petitioner's definition of the term, small utility units would fall within the thermal energy exception because their units, like all those subject to Title IV, literally produce "heat." *See* 42 U.S.C. § 7651a(15) (defining "unit" as "a fossil fuel-fired combustion device").

■ Although petitioner's definition may well be plausible, we have little trouble concluding that EPA's interpretation of the thermal energy exception is reasonable. *See Chevron,* 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11 ("The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction...."). Most important, the agency's definition is supported by the language of section 410(f) because it gives meaning to the word "thermal." *See Qi–Zhuo v. Meissner,* 70 F.3d 136, 139 (D.C.Cir.1995) ("An endlessly reiterated principle of statutory construction is that all words in a statute are to be assigned meaning, and that nothing therein is to be construed as surplusage."). If Congress had intended the thermal energy exception to apply to every opt-in unit, as it would under petitioner's definition, the word "thermal" would not have been needed.

EPA's interpretation is also compatible with the thermal energy exception's narrow purpose. The exception's author and principal proponent described its purpose as assuring "access to adequate allowances for independent power producers which are a small but increasingly important group of cogenerators of energy." 136 Cong. Rec. S3027 col.1 (daily ed. Mar. 22, 1990) (statement of Sen. Wirth). Explaining specifically how the exception would benefit this group, he stated:

> An independent power producer might—for example—enter into an arrangement with a papermill, where the mill shuts down its dirty boiler and agrees to buy steam from a cleaner facility from an IPP. The independent producer produces steam as an intermediate step toward generating electricity, so it has steam to sell. In this case, the independent producer ought to be able to purchase any unused allowances from the papermill.

*Id.* The only evidence of legislative intent behind the thermal energy exception, this statement supports EPA's construction. By permitting allowance transfers where industrial facilities shut down and receive steam from outside cogenerators, EPA's interpretation accomplishes precisely what the Senator's example calls for.

We are unpersuaded by petitioner's effort to paint a different picture of the legislative history. Neither the Senate bill, on which Title IV is based, nor the House bill contained an exemption from the allowance system for small utility units. *See* S. 1630, 101st Cong., 1st Sess. (1989); H.R. 3030, 101st Cong., 2d Sess. (1989). Thus, the opt-in provisions in each of the bills, including the thermal energy exception, applied to industrial sources, not small utility units. While Congress was reconciling the two bills in conference, small utility units received an eleventh-hour reprieve which shifted them into the opt-in program. *See* H.R.Rep. No. 952, 101st Cong., 2d Sess. 343 (1990), U.S.Code Cong. & Admin.News 1990, pp. 3385, 3875. To us, this suggests that Congress simply may never have considered whether utility units could or should fall within section 410(f)'s exception for "thermal energy."

EPA's interpretation of the thermal energy exception is also consistent with how the Federal Energy Regulatory Commission uses the words "thermal energy" in its rules implementing the Public Utility Regulatory Policies Act of 1978, 16 U.S.C. § 2601 *et seq.* (1994). 18 C.F.R. § 290 *et seq.* (1996). Those rules distinguish, as EPA has here, between electrical energy and "useful" thermal energy, the latter meaning steam or other heat used in an industrial process. *See* 18 C.F.R. §§ 292.202(c) (defining "co-generation facility"), 292.202(h) (defining "useful thermal energy output"). Although FERC's views are not controlling, we think it significant that another federal agency with relevant expertise takes essentially the same position as EPA, particularly since the distinction between "steam for industry" and "electricity" that forms the basis for FERC's rules appears in some of Title IV's provisions. For example, the definitions of "utility unit" and "industrial source" are both based, in part, on the two different end-uses of a unit's thermal output. *See* 42 U.S.C. §§ 7651a(17)(C) (exempting "[a] unit that co-generates steam and electricity" from the definition of "utility unit" under certain circumstances), 7651a(24) (defining "industrial source" as, among other things, "a unit that does not serve a generator that produces electricity").

█ Finally, EPA's interpretation of section 410(f) supports Title IV's principal goal of reducing sulfur dioxide emissions. Because allowances allocated to opt-in units are not counted towards the statutorily mandated 8.95-million-ton allowance cap, we think it was not unreasonable for EPA to interpret the scope of the exception narrowly in order to limit the number of additional allowances the exception might create. Petitioner's credible argument that a broader exception would encourage small utilities to retire their old, dirty units sooner suggests only that EPA's definition may be shortsighted, not that it is implausible. Whether the environmental benefits from earlier emissions reductions at small utilities outweigh the environmental costs of raising the allowance ceiling is a question for EPA and Congress, not this Court. *See Chevron,* 467 U.S. at 864, 104 S.Ct. at 2792 ("Such policy arguments are more properly addressed to legislators or administrators, not to judges.").

█ Petitioner's remaining arguments require only brief responses. First, petitioner asserts that we owe less deference to EPA's interpretation of section 410(f) because an EPA comment letter, written four years before the agency issued its final rule, stated that the thermal energy exception "appear[ed]" applicable to small utility units. *See* Letter, EPA Office of Air and Radiation, to Tom Fitzpatrick, SFT, Inc. (Mar. 7, 1991). We think it obvious that a preliminary assessment that the agency subsequently retracted can have no effect on our review of EPA's final rule. Petitioner also contends that EPA's interpretation of section 410(f) will exclude small utility units from the opt-in program entirely because those units cannot cost-effectively reduce their emissions. But a study commissioned by EPA suggests to the contrary—that the participation rate of small utility units, although low, will be comparable to that of industrial sources. *See* Potential Opt-ins Among Small Utility Units and Industrial Boilers 12 (Draft, Nov. 8, 1991). Finally, petitioner argues that EPA's interpretation will result in "significant competitive harm" to municipal utilities because large, investor-owned utilities are free to transfer allowances when their old units shut down. If this argument has merit—which is not at all obvious given the exemption existing small utility units enjoy—petitioner should make it in a different forum. Congress can level the playing field; we cannot. " 'Our Constitution vests such responsibilities in the political branches.' " *Chevron,* 467 U.S. at 866, 104 S.Ct. at 2793 (quoting *TVA v. Hill,* 437 U.S. 153, 195, 98 S.Ct. 2279, 2302, 57 L.Ed.2d 117 (1978)).

Because EPA's interpretation of section 410(f) is consistent with its language and legislative history, and with the purposes of Title IV, we deny the petition for review.

*So ordered.*