**BACKCOUNTRY AGAINST DUMPS**
**and Donna Tisdale, Petitioners,**

v.

**ENVIRONMENTAL PROTECTION**
**AGENCY, Respondent,**

Muht–Hei, Inc., et al., Intervenors.

No. 95–1343.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 4, 1996.

Decided Oct. 29, 1996.

Alan C. Waltner, Oakland, CA, argued the cause and filed the briefs, for petitioners.

Robert I. Dodge, Attorney, United States Department of Justice, Washington, DC, argued the cause for respondent. With him on the brief were Lois J. Schiffer, Assistant Attorney General, and Andrew G. Gordon, Attorney, Environmental Protection Agency. J. Steven Rogers, Attorney, United States Department of Justice, entered an appearance.

Kevin Gover, Albuquerque, NM, argued the cause for intervenor Campo Band of Mission Indians. With him on the brief were Kathrine E. Currie and Taylor O. Miller, Sacramento, CA. Irwin D. Karp, Sacramen-

to, CA, and Kimberly M. McCormick, San Diego, CA, entered appearances.

John H. Dossett, Washington, DC, was on the brief for amicus curiae National Congress of American Indians. Joel H. Mack, San Diego, CA, entered an appearance for intervenors Muht–Hei, Inc., et al.

Before: WALD, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

The Campo Band of Mission Indians, a small tribe in San Diego County, California, applied to the Environmental Protection Agency for approval of its solid waste permitting plan pursuant to the Resource Conservation and Recovery Act. That Act requires states to submit solid waste permitting plans to the agency for approval. The Act defines Indian tribes as municipalities, not states, and says nothing about municipalities submitting permitting plans for the agency's review. The EPA nonetheless determined that it had authority to approve the tribe's permitting program. Because we find that the Act does not give the EPA such authority, we grant the petition for review and vacate the agency's decision.

## I.

The Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901 *et seq.* (1994), establishes a "comprehensive federal program to regulate the handling of solid wastes." *Environmental Defense Fund v. U.S. EPA*, 852 F.2d 1309, 1310 (D.C.Cir. 1988). Subtitle C addresses the treatment, storage, and disposal of hazardous waste. 42 U.S.C. §§ 6921–6939e. Subtitle D governs the disposal of nonhazardous solid waste and of small-quantity hazardous solid waste not regulated under Subtitle C. 42 U.S.C. §§ 6941–6949a.

As originally enacted, Subtitle D required the EPA to publish regulations containing criteria for determining which solid-waste facilities should be classified as "landfills" and

which as "open dumps;" "open dumping" was prohibited. 42 U.S.C. § 6945(a). In 1984, Congress amended RCRA to require the EPA to issue additional revised criteria for facilities "that may receive hazardous household wastes or hazardous wastes from small quantity generators." 42 U.S.C. § 6949a(c). Codified at 40 C.F.R. part 258 (1995), the agency's revised criteria establish minimum federal standards to ensure that municipal solid-waste landfills—the facilities most likely to receive hazardous household waste—are designed and operated in a manner that protects human health and the environment. The revised criteria contain landfill location restrictions, landfill facility operating standards, landfill design standards, groundwater monitoring and corrective action criteria, closure and post-closure criteria, and financial assurance requirements. For all municipal solid-waste landfills operating within the jurisdiction of the United States, the revised criteria are self-implementing. This means that landfill owners and operators must comply with each element of the revised criteria with or without the oversight of a regulatory authority. 40 C.F.R. § 258.1(b). Failure to comply with the revised criteria exposes landfill owners or operators to citizen suits, 42 U.S.C. § 6972, EPA inspections, 42 U.S.C. § 6927, civil or criminal enforcement proceedings, 42 U.S.C. § 6928, or emergency abatement actions, 42 U.S.C. § 6973.

Section 6945(c), also added by the 1984 Amendments, requires states to implement permit programs to ensure that landfill facilities comply with the revised criteria. 42 U.S.C. § 6945(c)(1)(B). Section 6945(c)(1)(C) also directs the EPA Administrator to determine whether each state has developed an adequate solid waste permitting plan. States determined to have developed adequate programs are labeled "approved states." Approved states have distinct advantages over unapproved states: although all states must meet the part 258 operating standards, unapproved states must do so through the design standards specified in the C.F.R., while approved states may use alternative, more flexible design standards. Put another way, while the baseline requirements are the same

for approved and unapproved states, approved states may use different means to reach those ends. Under the revised criteria, for example, landfill owners or operators must "cover disposed solid waste with six inches of earthen material at the end of each operating day ... to control disease vectors, fires, odors, blowing litter, and scavenging." 40 C.F.R. § 258.21(a). Approved states may permit landfill operators to use "[a]lternative materials of an alternative thickness ... if the owner or operator demonstrates that the alternative material and thickness control disease vectors, fires, odors, blowing litter, and scavenging without presenting a threat to human health and the environment." 40 C.F.R. § 258.21(b).

The focus of this case is the statute's definition of "state." Section 6903(31) defines a "state" as "any of the several States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands." 42 U.S.C. § 6903(31). Indian tribes are listed in the statute's definition of "municipality:"

> The term "municipality" (A) means a city, town, borough, county, parish, district, or other public body created by or pursuant to State law, with responsibility for the planning or administration of solid waste management, or an Indian tribe or authorized tribal organization or Alaska Native village or organization, and (B) includes any rural community or unincorporated town or village or any other public entity for which an application for assistance is made by a State or political subdivision thereof.

42 U.S.C. § 6903(13). As "municipalities," Indian tribes are eligible for federal funding to develop solid waste management and resource recovery programs, 42 U.S.C. § 6948, and are also subject to citizen suits to enforce the revised criteria. 42 U.S.C. § 6972; *see Blue Legs v. U.S. Bureau of Indian Affairs,* 867 F.2d 1094, 1097 (8th Cir.1989) (since citizen suits may be brought against any "person" alleged to be in violation of RCRA, and municipalities are "persons" under the statute, Indian tribes are subject to citizen suits).

The Campo Band of Mission Indians occupies an approximately 23–square–mile reservation just north of the Mexican border in San Diego County, California. About 200 of its members live on the reservation. The tribe is governed by a General Council composed of all of its adult members.

In 1990, Mid–American Waste Systems, Inc. proposed developing a 600–acre landfill in the southeast corner of the Campo reservation. The landfill site is bordered on the east, south, and southwest by non-Indian farms and residences, including the residence of petitioner Donna Tisdale. As proposed by Mid–American, the landfill would have a 28–million–ton capacity, to be used over approximately 30 years. According to Tisdale and the other petitioner, Backcountry Against Dumps, the landfill would be the nation's largest solid-waste facility on an Indian reservation. The Bureau of Indian Affairs estimated the Band's share of facility revenues to be about $ 1.6 million a year.

Also in 1990, the tribe's General Council adopted the Tribal Environmental Policy Act of 1990 and a Solid Waste Management Code governing the construction and operation of solid-waste facilities on the reservation. These in turn established the Campo Environmental Protection Agency. With authority over all solid-waste operations on reservation land, this agency has primary responsibility for the enforcement of federal environmental laws on the reservation. The Tribe also established the Campo Band Environmental Appeals Court to hear appeals from final actions of the Campo Environmental Protection Agency, prohibited open dumping of solid waste within the reservation, and established a detailed system for managing solid waste.

In a draft application filed with the EPA in June 1993, the Campo Band sought approval of its solid waste program under section 6945(c). In reviewing the tribe's submission, the EPA relied on a draft "State/Tribal Implementation Rule" which establishes general procedures for EPA approval of tribal landfill permit programs. After receiving public comment on the tribe's plan and holding a public hearing, the EPA issued a Final Determination of Adequacy. 60 Fed.Reg. 21191

(1995). In its Final Determination, the EPA stated that, although section 6945(c) does not provide for Indian tribes to submit solid waste management plans for the agency's approval, it nevertheless "believe[d] that adequate authority exist[ed] under RCRA to allow tribes to seek an adequacy determination" for their solid waste management permitting programs. *Id.* In other words, the EPA treated the Campo Band as if it were a "state" for purposes of RCRA's solid waste permit provisions. Finding that the tribe's solid waste management regulations set forth "stringent standards" that met or exceeded federal standards, the EPA concluded that the tribe's program as a whole ensured compliance with federal solid waste management criteria. *Id.* at 21206. This was the first time the agency had approved an Indian tribe's permitting program under RCRA.

## II.

Petitioners argue that the EPA lacks authority to approve the Campo Band's solid waste permitting process, pointing out that the tribe is not a state under RCRA, but a municipality. According to the EPA, since RCRA does not indicate whether entities other than states may submit solid waste permitting plans for the agency's approval, we must defer to the agency's reasonable interpretation of the statute.

■ To resolve this dispute, we look to the familiar standards set forth in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Using "traditional tools of statutory construction," *id.* at 843 n. 9, 104 S.Ct. at 2782 n. 9, we first examine whether the statute "directly [speaks] to the precise question at issue," *id.* at 842, 104 S.Ct. at 2781—here, whether the statute authorizes the EPA to approve solid waste permitting plans submitted by Indian tribes. If so, we follow the statute's instructions. If Congress has not addressed the issue, we defer to the agency's interpretation if it is reasonable. *Id.* at 843–44, 104 S.Ct. at 2781–83.

■ We begin and end our analysis at *Chevron*'s first step. Section 6945(c) is clear on its face: "States" are required to submit solid waste management plans to the EPA for review and approval. Indian tribes are defined as municipalities, not states. Section 6945(c) says nothing about municipalities submitting their own solid waste permitting plans to the EPA. In approving the Campo Band's plan, the EPA essentially removed Indian tribes from their statutory status as "municipalities," creating a new, intermediate status for Indian tribes in section 6945(c), a status equivalent to that of a state. Not only does the agency's interpretation of section 6945(c) conflict with the plain language of RCRA's definitional provisions, but it also rewrites section 6945(c) itself. According to the agency, the formerly clear permitting provision now reads: "States must, and Indian tribes may, but other local governments may not" adopt permit programs and submit them to the agency for review and approval. This is not what the statute says.

We think it significant that when Congress wants to treat Indian tribes as states, it does so in clear and precise language. For example, a provision of the Clean Air Act authorizes the EPA Administrator to "treat Indian tribes as States" and requires the Administrator to promulgate regulations specifying the provisions of the Act under which it is appropriate to treat tribes as states. 42 U.S.C. § 7601(d) (1994). Likewise, the Safe Drinking Water Act authorizes the EPA Administrator to "treat Indian Tribes as States" and to delegate primary enforcement responsibility to tribes. 42 U.S.C. § 300j–11 (1994). A provision of the Clean Water Act provides that "Indian tribes shall be treated as States" for purposes of that Act. 33 U.S.C. § 1377(a) (1994). These clear statements of Congressional intent to treat Indian tribes as states stand in marked contrast to RCRA's equally clear requirement that "states"—not municipalities, and therefore not Indian tribes—must submit permitting plans for EPA's review.

Attempting to move past *Chevron* step one, the EPA argues that, since section 6945(c) is silent as to its application to Indian tribes, the statute is "ambiguous." Therefore, it argues, we must defer to its reasonable interpretation of the statute. This is not the first time the EPA has made such an

argument in this court. In *Ethyl Corp. v. EPA,* 51 F.3d 1053 (D.C.Cir.1995), the EPA refused to grant Ethyl's application for a waiver of the Clean Air Act's prohibition against a new fuel additive, finding a "reasonable basis for concern about the effects on public health that could result" if the EPA were to approve the additive. The governing statute instructed the Administrator to consider a new fuel additive's effects on emission standards. Because the statute was silent with respect to other considerations, the EPA claimed that it had broad discretion to consider other factors, including public health effects. We disagreed:

> Implicit in the EPA's argument is the notion that if Congress has not mentioned public health ... then Congress is "silent or ambiguous" as to that issue ... and the Agency therefore has discretion to regulate on the basis of that issue. This argument, however, misconstrues the *Chevron* analysis.
>
> . . . .
>
> "'To suggest, as the [agency] effectively does, that *Chevron* step two is implicated any time a statute does not expressly *negate* the existence of a claimed administrative power ... is both flatly unfaithful to the principles of administrative law ... and refuted by precedent."

*Ethyl,* 51 F.3d at 1060 (citation omitted) (alterations and omissions in second paragraph in original) (emphasis in original). We concluded that "'were courts to *presume* a delegation of power absent an express *withholding* of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well.'" *Id.* (quoting *Oil, Chem. and Atomic Workers Int'l Union v. NLRB,* 46 F.3d 82, 90 (D.C.Cir.1995) (quoting *Railway Labor Executives' Ass'n v. National Mediation Bd.,* 29 F.3d 655, 671 (D.C.Cir.1994) (*en banc*))) (emphasis in original); *see also American Petroleum Inst. v. U.S. EPA,* 52 F.3d 1113, 1120 (D.C.Cir.1995) (citing *Ethyl* and *Railway Labor Executives' Ass'n* for same proposition).

As in *Ethyl,* the statute here is neither silent nor ambiguous. It is quite clear. "States" must submit solid waste management plans to the EPA. Indian tribes are not states under the statute; they are municipalities. The EPA would have a stronger case if Indian tribes were not defined anywhere in the statute. *See, e.g., Nance v. EPA,* 645 F.2d 701, 713–14 (9th Cir.1981) (where Indian tribes not treated as "states" *or* "municipalities" prior to the amendment of the Clean Air Act, EPA filled gap in statute and allowed tribe to designate air quality standards on its land). Were that the case, we would move to *Chevron's* second step. But because Indian tribes are explicitly defined as municipalities, and because only states may submit solid waste management plans for EPA approval, the agency's position that it may approve plans submitted by Indian tribes is inconsistent with the statute's plain language.

■ Our determination that EPA lacks authority to approve the Campo Band's solid waste management plan does not, as both the agency and the Campo Band argue, strip the tribe of its sovereign authority to govern its own affairs. With its comprehensive environmental codes and an agency and court devoted solely to enforcing tribal and federal environmental regulations, the tribe has as much authority to create and enforce its own solid waste management plan as it ever had. The only difference between the Campo Band and states with approved plans is that a landfill operating on the reservation must comply with the part 258 design standards in addition to the operating standards. Referring back to our earlier example, a landfill operating on the reservation must use the "six-inches-of-earthen-cover" design rather than any equally effective alternative. In other words, what the tribe loses is the ability to take advantage of the leeway built into the regulations, including the ability to take site-specific factors into account.

■ According to the EPA, if it cannot review and approve tribal solid waste management plans, a "regulatory gap" will exist on reservation land, conjuring up the specter of Indian reservations as safe havens for all manner of illegal dumping activity. But this argument ignores the fact that even in the absence of an EPA-approved solid waste management plan, the revised criteria automatically apply to owners and operators of

solid-waste facilities. Individuals aggrieved by a facility's failure to comply with federal regulations may institute citizen suits against the offending facility owner, and Indian tribes are not exempted from citizen suits. 42 U.S.C. § 6972; *see Blue Legs,* 867 F.2d at 1096–98. The EPA, of course, may also initiate emergency abatement actions if it has evidence that an "imminent and substantial endangerment to health or the environment" exists. 42 U.S.C. § 6973(a). What the EPA complains of is not a "regulatory gap" at all, but the statute's different treatment of states and Indian tribes. Although treating tribes differently from states may be unfair as a policy matter, and may be the result of Congressional inadvertence, the remedy lies with Congress, not with the EPA or the courts. *See American Municipal Power–Ohio v. EPA,* 98 F.3d 1372, 1375 (D.C.Cir.1996) (where EPA's rational interpretation of Clean Air Act provision renders small power utilities unable to take advantage of certain emissions allowances, it is Congress, not the courts, that "can level the playing field").

The Campo Band and the EPA, however, need not wait for Congress to act to give the tribe the flexibility it seeks. At oral argument, all parties agreed that the Campo Band could seek EPA approval for a site-specific regulation, which would satisfy both RCRA and the tribe's desire for flexibility in designing and monitoring a landfill on its reservation. In fact, Campo Band's counsel told us at oral argument that, because the reservation is located in a seismic zone, the tribe may have to seek such a site-specific ruling in order to maintain a landfill facility. *See* 40 C.F.R. §§ 258.13–.14 (regarding placement of solid-waste treatment facilities in fault areas and seismic zones).

We grant the petition for review and vacate the EPA's Notice of Final Determination.

*So ordered.*