**WESTERN COAL TRAFFIC LEAGUE, et al., Petitioners,**

v.

**SURFACE TRANSPORTATION BOARD and United States of America, Respondents.**

**Norfolk Southern Corporation, et al., Intervenors.**

**Nos. 00–1115, 00–1118 and 00–1120.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 13, 2000.

Decided July 14, 2000.

---

Roy T. Englert, Jr. argued the cause for petitioners. With him on the briefs were Erika Z. Jones, David I. Bloom, Adam C. Sloane, William L. Slover, C. Michael Loftus, Robert D. Rosenberg, Paul A. Cunningham, David A. Bono, Richard B. Herzog, Gerald P. Norton, Richard E. Weicher, Robert B. Fiske, Jr. and Guy Miller Struve.

Robert P. vom Eigen, Roderick B. Williams, Frederic L. Wood, Nicholas J. DiMichael, Harold A. Ross and Daniel R. Barney were on the joint brief of intervenors Gaylord Container Corporation, et al., and amici curiae The Fertilizer Institute, et al., in support of petitioners. Thomas J. Litwiler and Peter S. Glaser entered appearances.

Craig M. Keats, Associate General Counsel, Surface Transportation Board, argued the cause for respondents. With him on the brief was Ellen D. Hanson, General Counsel.

George A. Aspatore, G. Paul Moates, Vincent F. Prada, Paul A. Hemmersbaugh, Peter J. Shudtz, Dennis G. Lyons, Terence M. Hynes, James V. Dolan, Louise A. Rinn, J. Michael Hemmer, David L. Meyer, William A. Mullins, Clinton J. Miller,

III, Daniel R. Elliott, III, Gregory B. Robertson, Daniel A. LaKemper and John D. Sharer were on the joint brief of intervenors Norfolk Southern Corporation, et al., and amici curiae James River Coal Company, et al., in support of respondent. Louis E. Gitomer, Donald H. Smith and William A. Mullins entered appearances.

Before: WILLIAMS, GINSBURG and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

Dissenting opinion filed by Circuit Judge SENTELLE.

GINSBURG, Circuit Judge:

The Western Coal Traffic League, the Canadian National Railway Company (CN), the Burlington Northern Santa Fe Corporation, and the Burlington Northern and Santa Fe Railway Company (BNSF) (collectively, BNSF) petition for review of a decision by the Surface Transportation Board to place a 15–month "moratorium" upon the filing of railroad merger applications. The Board initiated the moratorium after BNSF and CN had notified the Board that they planned to submit a merger application. BNSF argues that the Board lacks the authority to impose a moratorium upon the filing of merger applications; by declaring the moratorium the Board violated its statutory duty to consider and to rule upon merger applications within a prescribed period of time; and that the Board's decision was arbitrary and capricious. We conclude the Board neither violated the statute nor otherwise exceeded its authority by imposing the moratorium and deny the petition for review.

## I. Background

The railroad industry has undergone a considerable consolidation in recent years, with the result that there remain only four large railroads in the United States and two in Canada. According to the Board, the most recent of these consolidations have led to severe disruptions in service. After BNSF and CN announced in December 1999 their proposal to merge as soon as the Board approved, the Board expressed concern that the merger could further exacerbate service problems; the Board also determined that the merger could well be the first in a final round of mergers that would leave only two major lines serving all of North America.

After BNSF and CN formally notified the Board on December 20, 1999 that they would file a merger application in three to six months, see 49 C.F.R. § 1180.4(b), the Board issued a Notice of Public Hearing and Request for Comments on the future of the railroad industry and on the proper role of mergers in shaping that future. See Decision, Public Views on Major Rail Consolidations, Ex Parte No. 582 (January 24, 2000). The Notice indicated that, although the Board was prompted to consider consolidation in the railroad industry in part because of the BNSF/CN proposal, the agency intended to consider the issues raised by consolidation separately from, and not as a "prejudgment" of, the BNSF/CN application. The Board did not mention in the Notice that it might impose a moratorium upon the filing of merger applications. At the conclusion of the comment period, however, the Board announced a 15–month moratorium upon the filing of merger applications because

> the rail community is not in a position to now undertake what will likely be the final round of restructuring of the North American railroad industry, and because [the Board's] current rules are simply not appropriate for addressing the broad concerns associated with reviewing business deals geared to produce two transcontinental railroads.

Decision, Public Views on Major Rail Consolidations, STB Ex Parte No. 582 (March 16, 2000); see also Corrected Decision, Public Views on Major Rail Consolidations, STB Ex Parte No. 582 (April 7, 2000). The Board stated it would use this time to review and revise its standards for considering merger proposals. Among the concerns raised by commentors, the Board

noted the service disruptions that had resulted from prior mergers, and the decreased competition that could result from further consolidation within the industry. The Board acknowledged that "holding up [the BNSF/CN] merger application proceeding would itself be viewed negatively by the financial markets as creating uncertainty," but found the potential benefits to the carriers of going forward at once on the merger application outweighed by the uncertainty of processing the application "without appropriate rules in place at the beginning to govern the proceeding."

BNSF contends—in a variety of ways—that the Board may not lawfully postpone its acceptance or its review of a railroad merger proposal. The petitioners' central argument and the theme underlying most of its arguments is that, under the timeline set out in 49 U.S.C. § 11325, the Board must accept when proffered any merger application that is complete, and must decide whether to approve the proposed merger within 16 months of receiving the application.

## II. Analysis

■ To the extent BNSF argues that the Board lacks the statutory authority to impose a moratorium, we review the Board's construction of the statute under the standards established in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). At step one we ask whether the Congress "has directly spoken to the precise question at issue." *Id.* at 842, 104 S.Ct. 2778. If it has, then we are bound to "give effect to the unambiguously expressed intent of Congress." *Id.* at 843, 104 S.Ct. 2778. If it has not, then we proceed to step two, and defer to the Board's interpretation of the statute so long as it is "based on a permissible construction of the statute." *Id.* Our inquiry at step two is informed by the Supreme Court's recent teaching in *Food and Drug Administration v. Brown & Williamson Tobacco Corp.*, —— U.S. ——, ——–——, 120 S.Ct. 1291, 1300–01, 146 L.Ed.2d 121 (2000), that a reviewing

court should "examin[e] a particular statutory provision ... '[in] context and with a view to [its] place in the overall statutory scheme' ... [and] be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency."

■ If we find (as we do) that the Board has the statutory authority to impose a moratorium, we will uphold its decision to do so as long as it "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)).

### A. The Board's Statutory Authority

■ The main statutory direction for the Board's review of merger proposals appears in 49 U.S.C. §§ 11324 and 11325. In § 11324(a) the Board is instructed to begin considering a merger application upon receipt of the application and to consider, among other things, "whether the proposed transaction would have an adverse effect on competition among rail carriers." 49 U.S.C. § 11324(b)(5). The Board must "approve and authorize" a merger it finds to be "consistent with the public interest." 49 U.S.C. § 11324(c).

Section 11325 instructs the Board within 30 days of receiving an application either to reject it as incomplete or, if it is complete, to publish notice of the application in the Federal Register. *See* 49 U.S.C. § 11325(a). The Board must conclude its evidentiary proceedings within one year of publishing the notice, and issue a final decision within 90 days of concluding the evidentiary proceedings. *Id.* § 11325(b)(3).

### 1. The Positions of the Parties

In the Decision announcing the moratorium, the Board explained that it could not then adequately determine whether any further railroad mergers were in the public interest. Indeed, the Board imposed the moratorium specifically in order to review its criteria for determining the public interest. In addition to the "public interest" mandate of § 11324(c), the Board cited as authority for the moratorium 49 U.S.C. § 721(a), which authorizes the Board to "carry out ... [and] prescribe regulations in carrying out" merger proceedings, and 49 U.S.C. § 721(b)(4), which authorizes the Board, "when necessary to prevent irreparable harm, [to] issue an appropriate order without regard to [certain requirements of the Administrative Procedure Act]."

BNSF emphasizes that § 11325 by its terms requires the Board to adhere to a strict timetable; once a complete application is proffered—and the Board does not claim that the BNSF/CN application will be incomplete—the Board must accept and consider it pursuant to the statutory timeline.* Because the moratorium "drains the force" of the deadlines set up in § 11325, BNSF maintains that authority for a moratorium must come "clearly" from the Congress.

As BNSF notes, none of the provisions cited by the Board expressly authorizes the agency to impose a moratorium upon the filing of merger applications. The general rulemaking authority of § 721(a) does not "trump" the specific requirements of § 11325 and, even assuming *arguendo* that the moratorium properly may be considered an injunctive-type order, which BNSF disputes, § 721(b)(4) does not relieve the Board of any of its statutory duties except adherence to the APA. Finally, BNSF urges that the Board's mandate to consider the "public interest" does not relieve the agency of the obligation to do so within the time frame provided in § 11325.

In response, the Board argues that the moratorium is consistent with its governing statute, understood in the light of applicable case law. First, the Board notes that it has been delegated by the Congress "exclusive and broad authority to determine whether rail mergers are in the public interest"; this "broad delegation" of authority, it argues, implicitly carries with it the discretion to place "a temporary hold" upon the receipt of merger applications when warranted by "extraordinary circumstances." Second, the Board relies upon several cases in which courts have upheld various agency decisions to place a moratorium or "freeze" upon the processing of applications. *See, e.g., Permian Basin Area Rate Cases,* 390 U.S. 747, 777–81, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968) (approving moratorium on rate proceedings under § 4(d) of Natural Gas Act); *Neighborhood TV Co., Inc. v. FCC,* 742 F.2d 629, 634–40 (D.C.Cir.1984) (approving interim processing procedures, pending promulgation of final rules, including freeze upon filing of certain applications for broadcast licenses); *Westinghouse Elec. Corp. v. NRC,* 598 F.2d 759, 769–76 (3d Cir.1979) (upholding two-year suspension of pending rulemaking and related licensing proceedings); *Krueger v. Morton,* 539 F.2d 235, 239–40 (D.C.Cir.1976) (upholding "pause" in issuance of coal permits as not abuse of discretion); *Kessler v. FCC,* 326 F.2d 673,

---

* The petitioner argues that we should analyze this case under *Chevron* step one; that is, the petitioner claims that the Congress has specifically addressed whether the Board has the authority to impose the moratorium. *See* Blue Br. 21–22. Although the dissent questions whether *Chevron* applies here, *see* Dis. Op. 1177–78, we take the arguments as we find them and do not on our own initiative review the agency's actions more searchingly than the petitioners request. *See Frederick Cty. Fruit Growers Ass'n v. Martin,* 968 F.2d 1265, 1272 (D.C.Cir.1992); *see also Forester v. Consumer Prod. Safety Comm'n,* 559 F.2d 774, 789–90 n. 22 (D.C.Cir.1977) (declining to apply more stringent standard of review because, among other things, neither party argued the point). And under *Chevron* step one our dissenting colleague and we are in agreement that "the statute is not free of ambiguity," and that we must therefore proceed under *Chevron* step two.

679–85, (D.C.Cir.1963) (upholding "freeze" upon acceptance of applications pending adoption of new rules). The Board argues that, like the agencies in the cited cases, it was reasonable in imposing the moratorium in order properly to determine where the public interest lies in light of the recent changes in the railroad industry, including increased concentration and the service disruptions that resulted from previous mergers.

### 2. Resolution

The statute does not address the unanticipated conflict this case presents between the process by which the Board is to review a proposed merger and the purposes for which the Board is to conduct its review. Because the Congress has not "directly spoken to the precise question at issue," *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778, we review the Board's resolution of that conflict under *Chevron* step two. Here we take BNSF's argument as implicitly including, in the alternative, the position that the Board's interpretation is unreasonable under *Chevron* step two. We acknowledge that it would not be illogical to infer that, because the Congress intended in § 11325 to expedite the Board's review of merger proposals, a moratorium that delays the start of that review depends upon an unreasonable reading of the statute as a whole. We are persuaded otherwise, however, by the numerous cases upholding agency decisions to defer actions mandated by statute (here, review of a proposed merger pursuant to the timetable in § 11325) where doing so is administratively necessary in order to realize the broader goals of the same statute (here, maintenance of rail service to the public and "competition among rail carriers," pursuant to § 11324).

For example, in *Westinghouse,* the Third Circuit considered whether the Nuclear Regulatory Commission had statutory authority to suspend for two years a rulemaking and a related licensing proceeding for recycling and reusing spent nuclear fuel. *See* 598 F.2d at 762–64. The NRC was prompted to halt such proceed-

ings after President Carter issued a policy statement expressing concerns about the use of recycled nuclear fuel. *Id.* at 764–65. The Commission also wanted time to receive the results of two on-going studies. *Id.* at 770. The petitioners argued that the Commission was bound by § 103 of the Atomic Energy Act of 1954 (AEA), which governs the grant of commercial licenses, to consider the applications under a set of criteria previously established by the Commission; that is, the agency could not issue a moratorium in the middle of an on-going proceeding. The court agreed with the petitioners' reading of § 103 but nonetheless rejected their argument, holding that the Commission's general duty to protect the common defense and security warranted its decision not to comply with the precise requirements of § 103:

> We agree with petitioners that under § 103, once an applicant complies with the provisions of the AEA and Commission rules and regulations, the NRC must issue a license unless it determines that "the issuance of a license to such person would be inimical to the common defense and security or to the health and safety of the public." But we do not believe that a finding of inimicality or noncompliance with the applicable requirements has to be made before the NRC may suspend license application proceedings. This would appear to be particularly true where a moratorium is declared to enable the Commission to make a reasoned decision regarding the rules and regulations that should be applied and whether the issuance of licenses would be inimical to the common defense and security.

*Id.* at 772; *see also Krueger,* 539 F.2d at 239–40 (Secretary's decision to suspend grants of coal permits consistent with larger objectives of statute).

Likewise, in *Commonwealth of Pennsylvania v. Lynn,* 501 F.2d 848 (D.C.Cir. 1974), we considered whether the Secretary of Housing and Urban Development was authorized to suspend several federal housing subsidy programs in order to

study and evaluate whether the programs actually were achieving—rather than frustrating—the purposes of the Congress in authorizing them. The relevant provisions of the housing statutes authorized the Secretary to enter into housing contracts, directed the Secretary to issue "pertinent regulations," and authorized the appropriation of sums necessary to conduct the programs. *See id.* at 852–53. There was no indication on the face of the statutes that the Secretary could suspend operation of the programs. *See id.* at 854.

Noting that the suspension " 'reflects real concern about the equity and efficiency of these programs,' " we asked: "(1) whether the Congress gave the Secretary discretion to halt the programs for program-related reasons, and (2) if so, whether that discretion was abused." *Id.* at 852. We then noted that determining whether the Congress had vested the Secretary with the discretion he claimed was "preeminently a question of intent." *Id.* An examination of the relevant statutes and legislative history yielded a further-refined analysis:

> The real question here is whether the Secretary has the discretion, or indeed the obligation, to suspend the programs' operation when he has adequate reason to believe that they are not serving Congress's purpose of aiding specific groups in specific ways, or are frustrating the national housing policies applicable to all housing programs. We think he has this limited discretion.

*Id.* at 855–56. We recognized that although ordinarily the Secretary would report to the Congress any major difficulty he was having with a particular program and await its action, in some situations the delay inherent in such a process may be untenable:

> If the programs are indeed disserving congressional policy, their continued operation at normal levels for the nine-month period deemed necessary for their evaluation would implicate the Secretary in a massive frustration of that

policy. Commitments made under these programs may obligate the federal government, irrevocably, to make very substantial outlays for ... many ... years.... A court is properly reluctant to conclude that Congress forbade the Secretary to withhold commitments of so vast a magnitude when he has good reason to believe that exercising his authority would be contrary to the purposes for which Congress authorized him to act.

*Id.* at 856.

In the present case, the Board believes that without an opportunity to re-evaluate its standards for determining the public interest, it too risks a "massive frustration" of congressional policies, here the substantive policies prescribed in §§ 11324(b)(5) & (c). The agency's concern in *Lynn* is equally present in this case: forcing the Board's hand before it is ready to act could bring about momentous changes in the railroad industry, including a loss of competition that may never be restored.

BNSF would have the court distinguish the line of cases just canvassed on the ground that the statutes in question did not contain specific timelines for processing applications. True enough, but we have also considered numerous cases in which an agency failed to meet a statutory deadline; in these cases we have similarly considered whether the agency has demonstrated a reasonable need for delay in light of the duties with which it has been charged. As we first indicated in *Telecommunications Research and Action Center v. FCC,* 750 F.2d 70 (D.C.Cir.1984), the specificity of the statutory timetable is merely one of six factors we consider when determining whether a protestant is entitled to relief from the agency's delay. *See TRAC,* 750 F.2d at 80. For example, the importance of meeting the statutory deadline must be weighed against the effect of expedited action upon "agency activities of a higher or competing priority," and the length of the delay must be considered.*

---

\* We recognize, of course, that unlike most un-

reasonable delay cases under *TRAC,* this ˌis

Consider *In re Barr Laboratories, Inc.*, 930 F.2d 72 (D.C.Cir.1991), which involved a 1984 amendment to the Food, Drug, and Cosmetic Act that required the Food and Drug Administration " '[w]ithin one hundred and eighty days of the initial receipt of a [generic drug] application ... [to] approve or disapprove the application.' " 930 F.2d at 74 (quoting 21 U.S.C. § 355(j)(4)(A)). The applicant claimed that the FDA had repeatedly exceeded the 180–day deadline in processing its applications, often taking more than twice the time allowed to process an application. *See id.* Despite the clear 180–day deadline in the statute, we denied the company's petition for mandamus because we simply were not in a position to dictate to the agency how to set its priorities:

> The agency is in a unique—and authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way. Such budget flexibility as Congress has allowed the agency is not for us to hijack.

*Id.* at 76.

Similarly, we will not dictate that the Board must comply with a deadline for determining whether a merger application is in the public interest when it claims, in apparent good faith, that in its "unique— and authoritative" view it needs time to reconsider its standards for evaluating the public interest. Although § 11325 clearly indicates a congressional intent for the Board to conduct merger reviews expeditiously, we must bear in mind that the Board is also charged, in reviewing merger proposals, with considering among other things "the effect of the proposed transaction on the adequacy of transporta-

tion to the public," and "whether the proposed transaction would have an adverse effect on competition among rail carriers." 49 U.S.C. § 11324(b)(1), (5); *see also id.* § 10101(4) (policies for regulating railroad industry include ensuring "effective competition among rail carriers" and that rail carriers "meet the needs of the public"). As the Board noted in announcing the moratorium, increased consolidation in the railroad industry gave rise to concerns about preserving competition in the industry, and the service disruptions that have resulted from previous mergers have similarly given rise to concerns about the ability of carriers to meet the needs of the public. Neither the statute nor the legislative history give any indication that the Congress considered compliance with the timeline in § 11325 more important than the substantive purposes for which the Board reviews merger applications. Indeed, forcing the Board to proceed pursuant to § 11325 before it has had an opportunity to determine where the public interest lies would defeat altogether the purpose of the agency's review, whereas allowing the Board to focus for a reasonable time upon revising its criteria would likely enable the Board to continue to meet its deadlines once it resumes processing applications.

The present state of the railroad industry thus is one of those "unanticipated circumstances" that require us to "construe the relevant statutes in a manner that most fully effectuates the policies to which Congress was committed." *Lynn*, 501 F.2d at 857. In doing so, we conclude under step two of *Chevron* that the Board has reasonably interpreted the relevant

not a mandamus proceeding; BNSF's burden is not to demonstrate that it has a "clear and indisputable entitlement to relief" but that the agency's interpretation of the statute it administers is not "permissible." The standards are similar, however, in that the considerations relevant in a mandamus case based upon unreasonable agency delay play a part in this case as well. The agency's defense of its interpretation depends primarily upon the claimed need to make a trade off between

statutory goals—expediting merger review, on the one hand, and preserving competition and service to the public on the other—that seem to conflict in the circumstances of this case. If these conflicting circumstances make reasonable the Board's interpretation of its authority to delay the processing of a merger application, then it must prevail regardless whether the question is that posed under *Chevron* step two or under *TRAC*.

statutes to accommodate a moratorium where necessary to carry out its duties to preserve competition and protect the public interest. Where, as in this case, there is no evidence (or indeed, allegation) of bad faith on the part of the agency, and the agency has demonstrated a reasonable need for delay, "we have no reason to think that judicial intervention would advance either fairness or Congress's policy objectives." *In re Barr Labs.*, 930 F.2d at 76.

As the *TRAC* cases make clear, however, we do not grant the agency a free pass; we expect that the Board's effort to devise new standards will be undertaken expeditiously, and that the agency will resume its acceptance and review of merger applications promptly at the end of the 15–month moratorium. *See also In re United Mine Workers of America Int'l Union*, 190 F.3d 545, 550–51, 556 (D.C.Cir.1999) (holding Mine Safety and Health Administration violated express statutory timetable for issuing regulation but, instead of issuing writ of mandamus, retaining jurisdiction over case to assure final agency action without undue further delay). Otherwise, as the Board correctly acknowledged at oral argument, should BNSF bring a claim of unreasonable delay after the 15 months have run, the duration of the moratorium would be included in calculating the length of the agency's delay. *See Kessler*, 326 F.2d at 684 & n. 10.

## B. The Board's Regulatory Authority

■ BNSF also challenges the moratorium under 5 U.S.C. § 706(2) as an unauthorized, as well as an arbitrary and capricious, exercise of the Board's decisionmaking authority. It faults the Board for failing to indicate in its Notice of Public Hearing and Request for Comments either that it was considering the moratorium or that the hearing and comment period described in the Notice was actually part of a "rulemaking" proceeding. In addition, it argues that insofar as the moratorium is designed to maintain the "competitive balance" within the industry while the Board re-examines its standards for determining the public interest, it is an impermissible attempt by the Board to restrain competition. Finally, BNSF asserts that, assuming there is a need for revised merger standards, the Board acted arbitrarily and capriciously in imposing the moratorium without first considering: (1) its past experience in processing an application while simultaneously pursuing a related rulemaking; (2) the "flexible nature" of its rules regarding the determination of the public interest; and (3) the need for a 15–month as opposed to a shorter moratorium.

In response, the Board characterizes the moratorium as a "procedural rule" for which it was not required to give notice and an opportunity to comment, *see Neighborhood TV*, 742 F.2d at 638, and argues that even if it is a substantive rule, the Board has authority under § 721(b)(4) to issue it as an "appropriate order" without regard to the APA. The Board further defends the moratorium on its merits as a reasonable exercise of the agency's authority to consider, and to devise standards to protect, the public interest—not, as BNSF has argued, the interests of particular competitors—in regulating mergers.

Finally, invoking its "broad discretion" to decide how best to resolve the complex issues that come before it in merger cases, the Board explains that without a new set of standards already in place it would have no way to determine whether an application is complete, or to ensure that a record compiled under the existing standards contains the information that will prove necessary under the new standards. Similarly, if the Board proceeded with the application before devising new standards, other participants in the merger proceeding would have to respond to the BNSF/CN proposal without knowing the criteria under which the application ultimately would be evaluated.

Having already concluded that imposing the moratorium was within the bounds of the Board's statutory authority, for the

same reasons we also hold that the decision to impose the moratorium was neither arbitrary and capricious nor otherwise improper. The Board provided ample opportunity for public comment in its proceeding, as well as ample justification for its decision. Given the Board's "special cognizance" over the railroad industry, *National Motor Freight Traffic Ass'n v. ICC*, 590 F.2d 1180, 1185 (D.C.Cir.1978), we will defer to its "informed judgment," *id.*, regarding the need for the moratorium in order to develop new standards for determining the public interest in merger application proceedings.

### III. Conclusion

For the reasons stated above, the petition for review is

*Denied.*

SENTELLE, Circuit Judge, dissenting:

Congress has delegated to the Surface Transportation Board the authority to "approve and authorize" railroad mergers in 49 U.S.C. § 11324. In the controversy before us, two major railway corporations, Burlington Northern and Santa Fe Railway Company, and Canadian National Railway Company, notified the Board on December 20, 1999, of their intention to file a merger application in three to six months pursuant to a notification requirement imposed by the Board in 49 C.F.R. § 1180.4(b). Rather than proceeding to receive the application and process it, the Board issued a Notice of Public Hearing and Request for Comments on the future of the railroad industry, specifically on the role of major railroad consolidations, following which it imposed a moratorium on the filing of merger applications. The Board contends, and the court holds, that the moratorium is within the discretion of the Board under the applicable statutes analyzed in the framework of *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). I respectfully dissent.

First, I seriously question whether *Chevron* provides the appropriate frame-

work for analysis. Under that familiar rubric, as the Court reminds us, we are to proceed in a two-step analysis, asking in step one whether Congress "has directly spoken to the precise question at issue," *id.* at 842, 104 S.Ct. 2778; and in step two, whether the agency's interpretation is "based on a permissible construction of the statute," *id.* at 843, 104 S.Ct. 2778, in which case we are to defer to it. While we have repeatedly applied *Chevron* in the context of various forms of agency interpretation, the Supreme Court has more recently cautioned that its application should not be automatic where "an interpretation" is "not one arrived at after, for example, a formal adjudication or notice-and-comment rulemaking." *Christensen v. Harris County*, —— U.S. ——, ——, 120 S.Ct. 1655, 1662, 146 L.Ed.2d 621 (2000). Although the Board undertook a notice and comment proceeding in the present case, the moratorium imposed by the Board does not purport to be the product of that process, but only a hesitation while the Board conducts further notice and comment proceedings. I therefore question the applicability of *Chevron*. However, I do not contend that we must decide that *Chevron* is inapplicable, because in my view, even if it is applied, the moratorium is beyond the power of the Board.

At *Chevron* step one, I will concede that the statute is not free of ambiguity. To that extent, I accept the majority's statement on its face that "[t]he statute does not address the unanticipated conflict this case presents between the process by which the Board is to review a proposed merger and the purposes for which the Board is to conduct its review." Maj. Op. at 1173. In this case that is another way of saying, "the statute is silent as to the Board's authority to impose a moratorium, and we therefore examine the relevant statutory provisions under step two of *Chevron*." However, in accepting that proposition, I do note that as a general matter, the absence of a statutory grant of power is not an ambiguity or silence on the question of whether Congress has granted

such a power. *See, e.g., Adams Fruit Co. v. Barrett,* 494 U.S. 638, 649, 110 S.Ct. 1384, 108 L.Ed.2d 585 (1990); *Backcountry Against Dumps v. EPA,* 100 F.3d 147, 150–51 (D.C.Cir.1996); *Ethyl Corp. v. EPA,* 51 F.3d 1053, 1060 (D.C.Cir.1995). As we have noted repeatedly in the past, "to suggest ... that *Chevron* step two is implicated any time a statute does not expressly *negate* the existence of a claimed administrative power (*i.e.* when the statute is not written in 'thou shalt not' terms), is both flatly unfaithful to the principles of administrative law ... and refuted by precedent." *Railway Labor Executives' Ass'n v. National Mediation Bd.,* 29 F.3d 655, 670–71 (D.C.Cir.1994) (en banc); *see also Backcountry Against Dumps,* 100 F.3d at 151; *Ethyl Corp.,* 51 F.3d at 1060; *Oil, Chem. and Atomic Workers Int'l Union v. NLRB,* 46 F.3d 82, 90 (D.C.Cir. 1995); *American Petroleum Institute v. EPA,* 52 F.3d 1113, 1120 (D.C.Cir.1995). "[W]ere courts to *presume* a delegation of power absent an express *withholding* of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well." *Backcountry Against Dumps,* 100 F.3d at 151 (internal quotation marks omitted). Therefore, I am concerned that we not be too facile in accepting the proposition that Congress has left an ambiguity as to a power grant simply by not mentioning it. Again, however, I will accept the majority's assertion of ambiguity, because I think even accepting it does not compel the majority's result. That is, if we reach step two of *Chevron* and examine whether the interpretation is a permissible, *i.e.* reasonable, one, I would hold that it is not.

As I understand the rationale of *Chevron,* it is that Congress by entrusting an ambiguous statutory provision to the elucidating authority of an agency implicitly delegates to the agency the power to enter authoritative constructions for the purpose of accomplishing the goals of the "statutory scheme it is entrusted to administer." *Chevron,* 467 U.S. at 844, 104 S.Ct. 2778; *see also Adams Fruit,* 494 U.S. at 649, 110 S.Ct. 1384 ("A precondition to deference under *Chevron* is a congressional delegation of administrative authority."). In determining whether an interpretation subjected to *Chevron* step two analysis is a reasonable exercise of the implicit grant created by the ambiguity, we are to "examin[e] a particular statutory provision" in " 'context and with a view to [its] place in the overall statutory scheme.' " *Food and Drug Admin. v. Brown and Williamson Tobacco Corp.,* —— U.S. ——, ——–——, 120 S.Ct. 1291, 1300–01, 146 L.Ed.2d 121 (2000) (quoting *Davis v. Michigan Dep't of Treasury,* 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989)).

The statutory scheme under which the Surface Transportation Board operates is not limited to directing the Board to review mergers with the mandate to consider the public interest, and authorizing the Board to promulgate regulations to accomplish that command. As the majority lays out, Congress also mandated that the Board is to receive filings of merger applications, reject them if incomplete, or give notice of their filing if complete, within thirty days. *See* 49 U.S.C. § 11325(a) (Supp. III 1997). The Board then undertakes an evidentiary proceeding, which it must conclude within one year of the publication of the notice. *See id.* § 11325(b)(3). Lastly, the Board must issue a final decision within ninety days of the conclusion of that proceeding. *Id.* In other words, Congress included very specific statutory directives concerning the process and time frame for the Board to accomplish its adjudicatory task. The fact that Congress, in enacting these provisions, shortened the statutory review period from 31 to 16 months further supports the conclusion that Congress intended the merger review process to be completed expeditiously within the statutory deadlines. *Compare* ICC Termination Act of 1995, Pub.L. No. 104–88, § 102(a), 109 Stat. 803, 841–42 (codified at 49 U.S.C. § 11325), *with* Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94–210, § 402, 90 Stat. 31, 62–63.

In the interpretation before us, rather than determining the application of a theretofore ambiguous provision in such a fashion as to carry out the apparent will of Congress, the Board appears to me to have taken the license granted it under *Chevron* as an invitation to distort the language of Congress in such a way as to defeat the unambiguous will of that body. Granted, Congress places deadlines only upon the processing of applications once filed. *See* 49 U.S.C. § 11325(a), (b). However, Congress also provides for the refusal only of incomplete applications. *See id.* § 11325(a). It seems to me unreasonable to believe that Congress could have intended to expedite all completed applications by deadlines on handling of such filed applications only to leave the agency with the unbridled discretion to thwart the congressional mandate of expedition by the exercise of a power nowhere expressly granted—to refuse filing in the first instance.

Despite the clarity and specificity with which Congress articulated its wish that the merger review process be completed expeditiously within a given series of deadlines, the majority nevertheless concludes that, in combination, two separate lines of judicial precedent permit the Board to disregard an express congressional mandate. In one series of cases, the Supreme Court and we have recognized agency discretion to delay considering applications where no mandatory statutory deadline scheme such as the one at issue here existed. *See, e.g., Permian Basin Area Rate Cases,* 390 U.S. 747, 777–81, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968) (involving only an optional five-month suspension of proposed rates, plus the authority to reverse rates retroactively should the agency's investigation exceed five months); *Westinghouse Elec. Corp. v. NRC,* 598 F.2d 759, 771–76 (3d Cir.1979) (noting that the statute in question was "free of close prescription ... as to how [the agency] shall proceed in achieving the statutory objectives") (quoting *Siegel v. Atomic Energy Comm'n,* 400 F.2d 778, 783 (D.C.Cir.1968)); *Krueger v. Morton,* 539 F.2d 235, 239–40 (D.C.Cir.1976) (containing no mention of statutory or regulatory

deadlines of any sort); *Pennsylvania v. Lynn,* 501 F.2d 848, 854–61 (D.C.Cir.1974) (mentioning no statutory deadline which might contradict the suspension in question, and recognizing instead evidence of congressional acceptance of the moratorium's legality). Notably, moreover, a number of the cases cited by both the Board and the majority as supporting the application of the same proposition here do not involve challenges to the authority of the agencies in question to freeze applications, but instead ask only whether the agencies followed proper procedure or acted arbitrarily and capriciously. *See Neighborhood TV Co. v. FCC,* 742 F.2d 629, 634–40 (D.C.Cir.1984) (raising no statutory authority issue at all, but rather focusing upon whether the agency's decision to freeze applications violated Administrative Procedure Act requirements); *Kessler v. FCC,* 326 F.2d 673, 679–85 (D.C.Cir.1963) (mentioning no statutory or regulatory deadlines, and considering only whether the agency followed proper procedure or was arbitrary and capricious in opposing an applications freeze).

Although it acknowledges that these various cases did not involve specific timelines for processing applications, *see* Maj. Op. at 1174, the majority nevertheless points to another group of cases stemming from *Telecommunications Research and Action Center v. FCC,* 750 F.2d 70 (D.C.Cir.1984) (*TRAC*), in which we have weighed six factors to determine whether to take the extraordinary step of granting mandamus relief where agencies have failed to satisfy specific statutory deadlines. Granted, as the majority observes, in such cases, we have previously declined to use our equitable powers to micromanage an agency's efforts to balance its priorities, even in the face of a clear statutory timetable. *See, e.g., In re Barr Laboratories, Inc.,* 930 F.2d 72, 76 (D.C.Cir.1991) (viewing the agency delay in question as a consequence of the agency's allocation of its budgetary resources). *TRAC* and *Barr Laboratories* did not involve an agency's express interpretation of its governing statute, however. Unlike those cases, this

present one does not merely involve an agency that has simply failed to act within the statutory time frame. Rather, the Board has issued an order affirmatively asserting that particular statutory provisions implicitly delegate to it the authority to disregard the express commands of other statutory provisions as it sees fit. It is that pronouncement, and not merely the arguably inequitable consequences of the Board's delay, that we are called upon to consider here. In sum, none of the cited precedents dictates the outcome reached by the court today.

I also find unconvincing the argument of the agency that it could not accept the application because it did not have in place proper rules under which to process the same. For the most part, the Board has had the same rules since 1982. Granted, it has expressed its intent to modify those rules. Whenever that modification is completed, some application will have been the last processed under the old rules, some other the first under the new. I see nothing other than arbitrariness and caprice to justify requiring the present application to fill the role of the latter rather than the former. I respectfully dissent.