237 F.3d 676 (D.C. Cir. 2001)
 Association of American Railroads, Petitioner
v.
Surface Transportation Board and United States of America, Respondents
National Industrial Transportation League, et al., Intervenors
Union Pacific Railroad Company, Petitioner
v.
Surface Transportation Board and United States of America, Respondents
 No. 99-1354 No. 99-1355
 United States Court of Appeals FOR THE DISTRICT OF COLUMBIA CIRCUIT
 Argued November 29, 2000
Decided January 30, 2001
 
 On Petitions for Review of Orders of the Surface Transportation Board
 Samuel M. Sipe, Jr. argued the cause for the petitioners. Cynthia L. Taub, Louis P. Warchot, James V. Dolan, Louise A. Rinn, S. William Livingston, Jr. and Michael L. Rosenthal were on brief.
 Thomas J. Stilling, Attorney, Surface Transportation Board, argued the cause for the respondents. Joel I. Klein, Assistant Attorney General, United States Department of Justice, Robert B. Nicholson and John P. Fonte, Attorneys, United States Department of Justice, Ellen D. Hanson, General Counsel, Surface Transportation Board, and Craig M. Keats, Associate General Counsel, Surface Transportation Board were on brief. Henri F. Rush, Counsel, Surface Transportation Board, entered an appearance.
 William L. Slover, John H. LeSeur, Christopher A. Mills, Peter A. Pfohl, Nicholas J. DiMichael, John K. Maser, III., Frederic L. Wood, Karyn A. Booth, John M. Cutler, Jr., Edward D. Greenberg, David K. Monroe, Andrew P. Goldstein, Martin W. Bercovici, Arthur S. Garrett, II., Michael F. McBride, Bruce W. Neely, Henry M. Wick, Jr., Vincent P. Szeligo and William W. Binek were on brief for intervenors American Chemistry Council, et al. Michael M. Briley entered an appearance.
 Before: Henderson, Rogers and Tatel, Circuit Judges.
 
 
 1
 Opinion for the court filed by Circuit Judge Henderson.
 
 Karen LeCraft Henderson:
 
 2
 The Association of American Railroads (AAR) and Union Pacific Railroad Company (Union Pacific) challenge a Surface Transportation Board (STB) rulemaking which altered the Board's guidelines for finding that a particular rail carrier enjoys "market dominance," a statutory prerequisite to hearing a railroad rate challenge. Before the rulemaking the guidelines required that the Board, in making the market dominance determination, consider both "direct" competition to the challenged carrier, by shippers that would carry the same products (whether by rail or otherwise) from the same location to the same destination, and "indirect" competition using alternate routes (geographic competition) or different products (product competition). The challenged STB decision eliminated consideration of indirect competition. Petitioner AAR and Union Pacific[1] contend that the statutory definition of "market dominance" in 49 U.S.C. § 10709(a) requires that the Board consider both direct and indirect competition.[2] Although we reject the petitioners' construction of section 10709(a), we nonetheless remand for the Board to reconsider its decision in light of the strong language favoring rail deregulation set out in 49 U.S.C. § 10101(1).
 
 I.
 
 3
 Before 1976 the Interstate Commerce Commission (ICC or Commission) was charged with examining every railroad shipping rate to ensure that it was "just and reasonable." See 49 U.S.C. S 1(5) (1976). In 1976, however, the Congress enacted the Railroad Revitalization and Regulatory Reform Act, Pub. L. No. 94-210, 90 Stat. 31 (4R Act), which largely deregulated railroad rates so that thenceforth the ICC was authorized to examine a rail carrier's service rate only if it first affirmatively found that the carrier had "market dominance over such service." Pub. L. No. 94-210, S 202(b), 90 Stat. at 35. The 4R Act expressly directed the ICC to "establish, by rule, standards and procedures for determining ... whether and when a carrier possesses market dominance over a service rendered or to be rendered at a particular rate or rates," such rules to be "designed to provide for a practical determination without administrative delay." Id. S 202(d), 90 Stat. at 35. Pursuant to the Congress's directive, the ICC promulgated "Special Procedures for Making Findings of Market Dominance," which required that in making the market dominance determination the ICC consider only "direct" competition using the same point of departure and the same destination by other rail carriers ("intramodal competition") or by nonrail transport ("intermodal competition"). See 353 I.C.C. 874, modified, 355 I.C.C. 12 (1976). During the rulemaking, the ICC expressly declined to require consideration of "indirect" product competition (using a different product subject to a different rate) or geographic competition (using a different departure-point or destination). 353 I.C.C. at 904-07. In Atchison, Topeka & Santa Fe Ry. v. ICC, 580 F.2d 623, 62334 (D.C. Cir. 1978), this court upheld the Board's decision to exclude geographic and product competition.
 
 
 4
 In early 1980 the ICC proposed a rulemaking to, inter alia, add indirect competition to its market dominance calculus. See Ex Parte No. 320 (Sub-No. 1), Rail Market Dominance and Related Considerations, 45 Fed. Reg. 3353, 3357 (§ 1109.1(g)(4)(iv) (Jan. 17, 1980)). While the rulemaking was pending, the Congress enacted the Staggers Act to further deregulate rail transport. Pub. L. No. 96-448, 94 Stat. 1895 (1980).[3] The Staggers Act retained the requirement of a market dominance finding as a prerequisite to regulation as well as the existing statutory definition of the term and directed that the ICC "commence a proceeding for purposes of determining whether, and to what extent, product competition should be considered ... to determine the reasonableness of rail carrier rates." Id. S 205(a)(1), 94 Stat. at 1905. The Congress explained, however, that this directive was not to "be construed as altering the meaning, use, or interpretation by the Commission, the courts, or any party of the term 'market dominance,' as defined in section 10709(a) of title 49, United States Code." Id. S 205(a)(3)(B), 94 Stat. at 1906. Following the Congress's directive, the ICC instituted a new rulemaking and concluded that both product competition and geographic competition should be considered in making the market dominance determination.[4] Ex Parte No. 320 (SubNo. 2), Market Dominance Determinations and Consideration of Product Competition, 365 I.C.C. 118 (June 24, 1981). The Fifth Circuit Court of Appeals upheld the Board's determination. See Western Coal Traffic League v. United States, 719 F.2d 772 (5th Cir. 1983) (en banc), cert. denied, 466 U.S. 953 (1984).
 
 
 5
 In 1995 the Congress enacted the Interstate Commerce Commission Termination Act, Pub. L. No. 104-88, 109 Stat. 803 (1995), which abolished the ICC and vested in the newly fashioned STB, inter alia, the ICC's authority to regulate rail transportation rates. The ICC Termination Act left the statutory market dominance provisions intact.
 
 
 6
 On May 5, 1998 the Board published its "Proposal to Eliminate Product and Geographic Competition From Consideration in Market Dominance Determinations." 63 Fed. Reg. 24,588 (1998). After receiving comments the Board issued a decision dated July 1, 1999, announcing that geographic and product competition would no longer be considered in deter mining market dominance. Ex Parte No. 627, Market Dominance Determinations--Product and Geographic Competition (Dec. 21, 1998) (STB Dec.). The Board reasoned that the statute does not itself require their consideration and that the Board "can more expeditiously, efficiently and effectively carry out [its] mandated functions by limiting the market dominance inquiry to the scope expressly required by the statute." STB Dec. at 10, 12. The Board noted that "the time and resources" spent on indirect competition evidence and analysis, by both the parties and the Board, "can be inordinate." Id. at 12. The Board also determined the change would benefit shippers, which would not be so reluctant to challengerates if they did not have to litigate product and geographic competition, and that it would not substantially injure rail carriers, which, once a rate was challenged, could still rely on indirect competition to establish the rate's reasonableness. Id. at 12-14. AAR and Union Pacific petitioned for reconsideration which the Board denied on July 19, 1999. Ex Parte No. 627, Market Dominance Determinations--Product and Geographic Competition (1999) (Reconsideration Denial).
 
 II.
 
 7
 The petitioners first contend that the statutory definition of "market dominance" in section 10709(a) requires the Board to consider indirect product and geographic competition in determining market dominance. We disagree.
 
 
 8
 The result of the statutory evolution outlined above is that now "a rail carrier providing transportation subject to the jurisdiction of the Board ... may establish any rate for transportation or other service provided by the rail carrier" "[e]xcept as provided in subsection (d) of [49 U.S.C. S 10701] and unless a rate is prohibited by a provision of [part A of Subtitle iv of title 49]". 49 U.S.C. § 10701(c). The subsection (d) exception provides: "If the Board determines, under section 10707 of this title, that a rail carrier has market dominance over the transportation to which a particular rate applies, the rate established by such carrier for such transportation must be reasonable." Id. S 10701(d)(1). Section 10707, in turn, provides that if a rate is challenged, "the Board shall determine whether the rail carrier proposing the rate has market dominance over the transportation to which the rate applies," 49 U.S.C. S 10707(b), and "[w]hen the Board finds in any proceeding that a rail carrier proposing or defending a rate for transportation has market dominance over the transportation to which the rate applies, it may then determine that rate to be unreasonable if it exceeds a reasonable maximum for that transportation," id. S 10707(c). Finally, and most significantly here, section 10709(a) defines "market dominance" to "mean[ ] an absence of effective competition from other rail carriers or modes of transportation for the transportation to which a rate applies." Id. S 10709(a). The meaning of the word "competition" is the heart of this dispute.
 
 
 9
 The petitioners maintain that "competition" means all competition, whether direct or indirect. The Board, on the other hand, construed the term to mean only direct competition because the statutory language mentions only "competition from other rail carriers or modes of transportation for the transportation to which a rate applies," that is, competition "for moving the same product between the same origin and destination points." STB Dec. at 10. We conclude the Board's interpretation comports with section 10709(a)'s definition.
 
 
 10
 In Atchison the ICC advanced, and we endorsed, the same construction of the definition the Board adopted below. There we explained:
 
 
 11
 The Act defines "market dominance" as the "absence of effective competition from other carriers or modes of transportation, for the traffic or movement to which a rate applies...." Section 202(b) of the Act, 49 U.S.C. S 1(5)(c)(i). As a matter of strict logic, the phrase "for the traffic or movement to which a rate applies" would seem to exclude from consideration competition that manifests itself in the form of "traffic" or "movement" other than that to which the rate in question applies. Shipment of a product to another geographical location, or shipment of a different product, would certainly appear to involve "traffic" or "movement" other than that to which the rate applies. This is essentially the statutory argument advanced by the Commission. Interim Report at 54, J.A. 778. The construction may appear to some as an attempt to attribute excessive significance to a terse statutory clause. But we cannot say that it is an unreasonable reading, particularly inlight of the clear emphasis placed by the Act upon efficiency and practicality.... The Commission's reading of the statutory definition of market dominance insures that the highly complex issues of geographic and product competition will not create delay in the determination of market dominance, even in the rebuttal stage of the proceeding. We believe there is sufficient basis in the statutory language and purpose to merit our deferral to the Commission's view.
 
 
 12
 580 F.2d at 634. But see Western Coal Traffic League, 719 F.2d at 772 n.10 (reviewing the same interpretation, court stated it was "hesitant to rely heavily upon a vague congressional use of prepositions in determining the extent of the ICC's jurisdiction to review rail rates"). Since Atchison, the Congress altered slightly the language of the statutory definition, substituting the word "transportation" for the phrase "traffic or movement," see Pub. L. No. 95-473, 92 Stat. 1337, 1382 (1978) [10706], but the change does not affect the reasonableness of the Board's interpretation.[5] The language may still be read to refer only to direct competition--which is, technically, the only competition for the particular transportation (of a single commodity by a single route) to which a specific rate applies. Further, the court's prediction in Atchison that this reading would prevent administrative delay, which would inevitably result from litigating "the highly complex issues of geographic and product competition," has been confirmed by the Commission's and the Board's experience since the guidelines were changed to include indirect competition in 1981. See Board Dec. at 10-11 (describing, with examples, extensive discovery generated in litigating product and geographic competition costs). Thus, the Board's construction of the statutory definition furthers its statutory mandate to "establish procedures to ensure expeditious handling of challenges to the reasonableness of railroad rates" which "procedures shall include appropriate measures for avoiding delay in the discovery and evidentiary phases of such proceedings." 49 U.S.C. § 10704(d). For these reasons, we conclude the Board's interpretation of section 10709(a)'s definition is reasonable and, considered in isolation, permissible. See Western Coal Traffic League v. STB, 216 F.3d 1168 (D.C. Cir. 2000) (court will "defer to the Board's interpretation of the statute so long as it is 'based on a permissible construction of the statute' ") (quoting Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984)). Nevertheless, our review does not end there.
 
 
 13
 The petitioners contend it was arbitrary and capricious for the Board to construe section 10709(a) as it did without considering the policy set out in the Staggers Act preamble. We agree. The preamble states:
 
 
 14
 In regulating the railroad industry, it is the policy of the United States Government
 
 
 15
 (1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail
 
 
 16
 ....
 
 
 17
 49 U.S.C. § 10101(1) (emphasis added). The italicized language, so forcefully expressed, manifests a preference for market-based rather than regulatory rate setting. Yet the Board did not address this important language in either its initial decision or its decision on reconsideration, as it ought to have done.[6] See Wyoming Outdoor Council v. United States Forest Serv., 165 F.3d 43, 53 (D.C. Cir. 1999) ("[A]lthough the language in the preamble of a statute is 'not an operative part of the statute,' it may aid in achieving a 'general understanding' of the statute.") (quoting Association of Am. R.Rs. v. Costle, 562 F.2d 1310, 1316 (D.C. Cir. 1977)); see also Chesapeake & Ohio Ry. v. United States, 704 F.2d 373, 375-76 (7th Cir. 1983) ("[T]he national transportation policy for railroads, 49 U.S.C. § 10101a [now § 10101], ... is to guide the Commission in applying the rail provisions of the Interstate Commerce Act."). Accordingly we remand this case to the Board to weigh the effect, if any, the quoted preamble language has on the statutory definition of market dominance set out in 49 U.S.C. § 10709(a).
 
 
 18
 So ordered.
 
 
 
 Notes:
 
 
 [1]
 The consolidated petitions filed by United Transportation Union-Illinois Legislative Board in Nos. 00-1047 and 00-1082 were denied in a judgment issued December 12, 2000.
 
 
 [2]
 On January 11, 2001 the court granted Union Pacific's motion to withdraw its additional challenge to the guidelines as impermissibly retroactive.
 
 
 [3]
 Significant to further deregulation, but not to this case, the Staggers Act established a conclusive presumption of no market dominance when a rate generated revenues below a certain threshold. See Pub. L. No. 96-448, § 202, 94 Stat. 1900.
 
 
 [4]
 Although the Staggers Act directive mentioned only "product competition," the statutory definition of the term was "such that it encompasses geographic competition as well." 365 I.C.C. at 127.
 
 
 [5]
 The change occurred in a statutory recodification intended to be effected "without substantive change." Pub. L. No. 95-473, 92 Stat. 1337, 1337. Before the recodification the 4R Act defined "market dominance" as "an absence of effective competition from other carriers or modes of transportation, for the traffic or movement to which a rate applies." Atchison, 580 F.2d at 627.
 
 
 [6]
 The Board simply referred to "the statutory policy favoring reliance on market-set rates." See Reconsideration Denial at 9-10.