ASSOCIATION OF AMERICAN RAILROADS, Petitioner,

v.

SURFACE TRANSPORTATION BOARD AND UNITED STATES OF AMERICA, Respondents.

**Edison Electric Institute, et al., Intervenor.**

No. 01–1213.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 12, 2002.

Decided Oct. 8, 2002.

Samuel M. Sipe, Jr., argued the cause for petitioner. With him on the briefs were Cynthia L. Taub and Louis P. Warchot.

Thomas J. Stilling, Attorney, Surface Transportation Board, argued the cause for respondents. With him on the brief were Ellen D. Hanson, General Counsel, Craig M. Keats, Deputy General Counsel, and John P. Fonte and Robert B. Nicholson, Attorneys, U.S. Department of Justice.

William L. Slover, John H. LeSeur, Christopher A. Mills, Peter A. Pfohl, John M. Cutler, Jr., Michael F. McBride, Bruce W. Neely, Nicholas J. DiMichael, Federic L. Wood, and Andrew P. Goldstein were on the brief for intervenors.

Before: SENTELLE and RANDOLPH, Circuit Judges, and SILBERMAN, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge SILBERMAN.

SILBERMAN, Senior Circuit Judge:

Association of American Railroads (AAR) challenges the Surface Transportation Board's (STB) April 6, 2001 "corrected decision," reaffirming its determination to exclude consideration of product and geographic competition from the market dominance analysis in rail rate cases. In *Association of American Railroads v. Surface Transportation Board*, 237 F.3d 676 (D.C.Cir.2001) (*AAR v. STB I*), we held that the Staggers Act definition of "market dominance" does not require the STB to consider indirect (product and geographic) competition. However, on remand we di-

rected the Board to "weigh the effect, if any" of the statute's preamble, manifesting a preference for marketbased rather than regulatory rate setting, on its decision. We conclude that the STB's new decision appropriately addresses this language.

## I.

Congress originally gave the Interstate Commerce Commission (ICC) the authority to examine *every* railroad shipping rate to ensure that it was "just and reasonable." *See* 49 U.S.C. § 1(5)(1976). But, discovering that such a broad regulatory scheme was unhealthy for the industry, Congress passed the Railroad Revitalization and Regulatory Reform Act, Pub.L. No. 94–210, § 202(b), 90 Stat. 31 (4R Act), to deregulate rail rates. Under this statute, the ICC could only review the reasonableness of a carrier's rates if it had first found that the railway had market dominance over its service. Market dominance is defined as "an absence of effective competition from other rail carriers or modes of transportation to which a rate applies." 49 U.S.C. § 10707(a). The Act also directed the commission to "establish, by a practical determination, the rules, standards and procedures of determining whether and when a carrier possesses such dominance ... *without administrative delay.*" Pub.L. No. 94–210, § 202(d), 90 Stat. at 35. (emphasis added).

Initially, the ICC's "Special Procedures for Making Findings of Market Dominance" only considered direct competitors who operated along the same points of departure and destination, including fellow rail carriers (intramodal competitors) and non-rail transporters (intermodal competitors). The Commission expressly declined to require a consideration of indirect product competition (using a different product subject to a different rate), or geographic competition (using a different departurepoint or destination). We held that this arrangement was consistent with a reasonable reading of the statute, particularly in light of the Act's clear preference for efficient and practical proceedings. *Atchison, Topeka & Santa Fe Ry. v. ICC,* 580 F.2d 623, 623–34 (D.C.Cir.1978).

In 1980, the ICC proposed rulemaking to add indirect competition to its market dominance analysis. While the rulemaking was pending, Congress enacted the Staggers Act to deregulate the rail industry even further. Pub.L. No.96–448, 94 Stat. 1895 (1980). The new law kept the market dominance calculus as a prerequisite for Commission regulation, and directed the ICC "to determine whether, and to what extent, product competition should be considered ... in determining the reasonableness of the rail carrier rates." *Id.* § 205(a)(1), 94 Stat. at 1905. This directive, however, did not alter the meaning or use of the term "market dominance." *Id.* § 205(a)(3)(B), 94 Stat. at 1906. In response, the ICC decided to issue a new rule requiring both product and geographic competition to be considered in the market dominance analysis. The Fifth Circuit upheld this decision in *Western Coal Traffic v. United States,* 719 F.2d 772 (5th Cir.1983) (en banc), *cert. denied,* 466 U.S. 953, 104 S.Ct. 2160, 80 L.Ed.2d 545 (1984).

In 1995 Congress abolished the ICC and vested its authority to regulate rail rates in the Surface Transportation Board. The STB issued a decision on July 1, 1999 removing indirect competition from the market dominance calculus. *Ex Parte No. 627, Market Dominance Determinations–Product and Geographic Competition* (Dec. 21, 1998) (STB Dec. 1998). The Board believed that the change was permissible under the Staggers Act, since its language does not actually require that indirect product competition be considered in the market dominance formula. And it believed that the revision was warranted because the time and resources spent on

indirect competition evidence in rate litigation was often inordinate, preventing the Board from providing for the expeditious handling and resolution of all proceedings, as mandated by other Staggers Act provisions. The Board thought the change would benefit shippers, especially the smaller and more rural ones, because under the new rule, there would be less disincentive to challenge rates as a result of the reduction in litigation burdens and costs. Yet it also would be fair to carriers, who could still point to indirect competition to defend the reasonableness of their rates in particular cases. STB Dec. 1998 at 12–14.

The AAR disagreed and sought review of the Board's decision. In *AAR v. STB I* we rejected the Petitioner's claim that the Staggers Act's amendments and additions to the 4R statute, one of which merely substituted the word "transportation" for the phrase "traffic or movement" in the statutory definition of market dominance, *see* Pub.L. No. 95–473, 92 Stat. 1337, 1382 (1978) [10706], altered the force of our *Atchison* holding. *AAR v. STB I*, 237 F.3d at 679. We were of the view that under *Chevron*[1] the Board maintained discretion to interpret the market dominance definition so as to exclude indirect competition. Therefore, we deferred to its latest interpretation and accepted the Board's reasoning that the decision would reduce administrative delay by limiting the litigation of the innately complex issues of geographic and product competition. *Id.* at 680. Accordingly, the decision would advance the Staggers Act mandate to "establish procedures to ensure expeditious handling of challenges to the reasonableness of railroad rates ... which shall include appropriate measures for avoiding delay in the discovery and evidentiary phases of such proceedings." *Id.*; 49 U.S.C. § 10704(d).

Although we thought the Board's decision "reasonable in isolation"–meaning as an interpretation of the key language–we decided that it was arbitrary and capricious for the Board to construe market dominance without considering the preamble policy. On remand, we directed the STB to "weigh the effect, if any" of the language calling for "competition and demand for services ... to establish reasonable rates for rail transportation ... *to the maximum extent possible* ...," on its determination. *Id.*; 49 U.S.C. § 10101(1). After the Board denied AAR's request to reopen the administrative record and solicit comments, on the grounds that it had already considered its alternative measures, it issued its official response on April 6, 2001. In this corrected decision, the Board explained that the first preamble policy (RTP–1) is "not inconsistent" with its decision to exclude product and geographic competition from consideration in the market dominance analysis. It claimed a responsibility to apply, not one, but all 15 "separate and sometimes conflicting policy goals that together establish the framework for regulatory oversight of the rail industry." *Ex Parte No. 627, Market Dominance Determinations— Product and Geographic Competition* (April 6, 2001) (Corrected Decision at 6). AAR then brought this petition for review, contending that the Board did not properly respond to the Court's remand order.

## II.

There is not much left to this case. We have already decided that the Board's reading of the statute is permissible. *AAR v. STB I*, 237 F.3d at 680. Neither the law of the circuit nor the law of the

---

**1.** *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

case permits us to reconsider. that issue, despite the Petitioner's efforts to have us do so. *See LaShawn A. v. Barry,* 87 F.3d 1389, 1395 (D.C.Cir.1996) (en banc). Therefore the only matter legitimately before us is whether or not the Board's 2001 decision included an adequate "weighing" of the preamble's first policy directive set out in the Staggers Act. The provision states:

> In regulating the railroad industry, it is the policy of the United States Government—
>
> > (1) to allow, *to the maximum extent possible,* competition and the demand for services to establish reasonable rates for transportation by rail. 49 U.S.C. § 10101(1) (emphasis. added).

The Board reasonably considered the effects of RTP–1. It does not believe that this preamble provision necessarily trumps the other (somewhat contradictory) policy goals in the statute. We have previously held that it is up to the Board to arrive at a reasonable accommodation of the conflicting policies set out in the Staggers Act. *See Baltimore Gas & Elec. Co. v. United States,* 817 F.2d 108, 115 (D.C.Cir.1987). RTP–1, although indeed a forceful expression of a strong preference for market-based rather than regulatory rate setting, does not compel the Board to alter its decision in this case.

The Board believes that eliminating indirect competition from the market dominance calculus reflects a proper balance between RTP–1, expressing Congress's desire to have competition determine rail rates where possible, and RTPs–2 and 15, obliging the Board to "provide for the expeditious handling and resolution of all proceedings where regulation is required." 49 U.S.C. §§ 10101(2)-(15). It has ob-

served that ·discovery in individual cases has often included hundreds of questions directed to the existence or effectiveness of product and geographic competition. Evidence of indirect competition has also forced the Board to .address matters outside· their area of expertise, adding to the time needed to resolve rate cases. STB July '99 Dec. at 10–11; STB 2001 Dec. at 2–3.. In short, the Board's construction of the statutory definition furthers its statutory mandate, added by the ICCTA in 1995, to establish procedures to ensure expeditious handling of challenges to the reasonableness of railroad rates, including "appropriate measures for *avoiding delay* in the *discovery* and *evidentiary* phases of such proceedings." 49 U.S.C. § 10704(d) (emphasis added). This decision may· also allow shippers that lack competitive alternatives practical access to the rate complaint process. According to the Board, that would give real meaning to RTP–6, promoting the maintenance of "reasonable rates where there is an absence of effective· competition." 49 U.S.C. § 10101(6). While we recognize that the Board's construction was . not the only permissible view, its attempt to strike a balance between the various statutory objectives is reasonable (not arbitrary or ˙ capricious).

To be sure, we need not agree with every reason that the Board advances in support of its decision. Although the Petitioner has conceded that market forces will compel carriers to offer reasonable rates where there is effective competition, the Board's argument that shippers will not bring rate claims where indirect competition genuinely exists may be an overstatement. It is certainly plausible that some shippers would consider regulators' hands to be friendlier than invisible ones.[2]

---

**2.** The expense of litigating rate cases has not prevented all shippers from filing cases where competition exists. Coal shippers, in particular, are inclined to bring rate cases even

where prices may be constrained by indirect competition. Comments of the Ass'n of American Railroads, *Ex Parte No. 627* (served Apr. 29, 1998).

**1112**

Nevertheless, it is reasonable to presume that if Congress had wanted indirect competition to be a mandatory consideration in the market dominance inquiry, it would have stated so directly. Instead, Congress determined to leave that decision to the agency, while still leaving an impression that it wanted less regulation, rather than more. *See Western Coal Traffic League v. United States*, 719 F.2d 772, 779 (5th Cir.1983). We have already held that the Board reasonably exercised its option, concluding that its latest decision can potentially accommodate the various statutory policies relating to expeditious review and access to relief while upholding congressional preferences for market-based rates. *AAR v. STB I*, 237 F.3d at 680.

It appears then, that the Petitioner is not only asking us to substitute our policy wisdom for that of the Board, but is also essentially requesting that we overrule our prior determination that the Board's decision to exclude evidence of indirect competition from the market dominance analysis was not arbitrary or capricious. We are not in either business.

Accordingly, the petition for review is denied.

*So ordered.*